**GARCIA & ARTIGLIERE**
Stephen M. Garcia, State Bar No. 123338
edocs@lawgarcia.com
David M Medby, State Bar No. 227401
dmedby@lawgarcia.com
One World Trade Center, Suite 1950
Long Beach, California 90831
Telephone: (562) 216-5270
Facsimile: (562) 216-5271

Attorneys for Plaintiffs Michael B. Arouh
and Arouh Law, PLLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL B. AROUH; and AROUH LAW, PLLC, <br><br> Plaintiffs, <br><br> vs. <br><br> GAN LIMITED; GAN NEVADA, INC.; DERMOT S. SMURFIT; BETTY WONG; DOES 1 - 100, inclusive <br><br> Defendants. | CASE NO. 8:23-CV-02001 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **(1) WRONGFUL TERMINATION** <br> **(2) BREACH OF CONTRACT – EMPLOYMENT CONTRACT** <br> **(3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br> **(4) WAITING TIME PENALTIES** <br> **(5) DECLARATORY RELIEF** <br> **(6) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> **(7) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> **(8) BREACH OF CONTRACT – LEGAL SERVICES AGREEMENT** <br><br> **JURY TRIAL DEMANDED** |

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Plaintiff MICHAEL B. AROUH ("Arouh" or "Plaintiff") and AROUH LAW, PLLC ("Law Firm") (collectively "Plaintiffs") bring the following Complaint against GAN LIMITED, GAN NEVADA, INC., DERMOT S. SMURFIT, BETTY WONG, and DOES 1-100 (collectively "Defendants"). GAN LIMITED, GAN NEVADA, INC., and DOES 1-100 are collectively referred to herein as "GAN". In support thereof, Plaintiffs Arouh and Law Firm allege, on information and belief, as follows:

## A.  **NATURE OF THE CASE**

1.      GAN and the other Defendants wrongfully terminated their employee and Chief Legal Officer Michael Arouh in violation of public policy, for discriminatory reasons, for exercising Plaintiff's legal rights, and/or in violation of the employment contract with Plaintiff. Defendants' wrongful termination was in violation of public policy, including but not limited to state law, such as the California Fair Employment and Housing Act ("FEHA"). Defendants' outrageous workplace conduct was aimed at causing Plaintiff emotional distress. Defendants also breached their employment contract with Plaintiff, and tortiously interfered with the prospective economic advantage of Plaintiff when he sought replacement employment by wrongfully revealing confidential information, making defamatory statements, and making tortious misrepresentations.

2.      GAN's work environment was openly hostile to Chinese people, Japanese people, Iranian people, Black people, women, old people, and Jewish people, among other protected classes. A substantial factor in Defendants' decision to wrongfully terminate Plaintiff was Plaintiff's objection to the hostile work environment created and condoned by GAN and the other Defendants.

3.      For example, GAN produced a derogatory video, widely circulated among executive leadership, that sought to exploit negative stereotypes regarding Chinese people, Japanese people, and other people of Asian descent. Plaintiff objected to the derogatory video.

4.      As another example, GAN's leadership bragged that a GAN director was

2

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

the "perfect director" because she is a Black woman who satisfies diversity requirements but "she doesn't look Black."

5.    As another example, GAN employees made offensive comments at company sponsored events such as: "like even a f\*\*king hooker would actually be willing to f\*\*k an Iranian."

6.    The following individuals, among others, likely have knowledge of facts and circumstances underlying some or all of the allegations in this Complaint: Dermot S. Smurfit, Seamus McGill, David Goldberg, Susan Bracey, Michael Smurfit, Karen Flores, Stephen D. Schrier, Esq., Michael P. Trainor, Esq., Betty Wong, Don Ryan, Anders Karlsen, Yannick A. Svendsen, Evelin Simer, Jeff Berman, Si Knock, Susan Vincent, Jennifer Chapman, Krista Pappas, Sylvia Tiscareno, Esq., Brian Chang, Hiroki Takahashi, Jevgeni Kapparov, Hannah Swales, Joann Pierce, Claire Bailiss, Tom Ustunel, and Gwenevere Crary, recipients of and participants in the widely distributed GAN videos mocking stereotypes of Chinese and Japanese (among others), the past and current Chief Information Officer and Chief Compliance Officer of GAN, and various regulators to whom GAN and Defendants made representations.

## B.  PARTIES

7.    Plaintiff Michael B. Arouh was the Chief Legal Officer and an employee of Defendants, including GAN, which had its headquarters in Irvine, California. Arouh was also named and served as Defendants' Corporate Secretary. The hiring of Arouh was approved by Defendants' board of directors. Arouh was employed by Defendants until he was wrongfully terminated on December 9, 2021.

8.    Plaintiff Arouh Law, PLLC is a professional limited liability corporation organized in New York. Prior to being employed by GAN, Arouh was an attorney and officer at Arouh Law, PLLC. Arouh Law, PLLC performed legal services for GAN.

9.    Defendant GAN LIMITED is, and at all times relevant to this action was, an entity publicly traded on the NASDAQ with its principal executive office located

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  at 400 Spectrum Center Drive, Irvine, California. Because GAN LIMITED'S
2  principal executive offices are located in the State of California, GAN LIMITED is a
3  citizen of the State of California. Plaintiffs are informed and believe, and thereon
4  allege that GAN is the number one online gaming platform in America, the
5  preeminent partner to bring real-money casino gambling and sports betting operations
6  online for elite companies in the industry, such as FanDuel (a subsidiary of Flutter
7  Entertainment and Fox Corporation), Paddy Power, Bet365, William Hill, Betfair,
8  Parx Casino, Red Rock Resorts, Inc. (Nasdaq trading symbol: RRR) (a/k/a Red Rock
9  Casinos), Jack Entertainment, Live! Casino, Intralot, Sisal, Lottomatica, Snai,
10  Eurobet, and Coolbet.  Native American clients of GAN in California alone include
11  the San Manuel Band of Mission Indians (operating as Yaamava' Resort & Casino at
12  San Manuel) and Agua Caliente Band of Cahuilla Indians (operating as Agua Caliente
13  Casinos), as well as at least four others. GAN also has over 1.2 million individual
14  registered customers from whom it accepts real-money bets to engage in on-line
15  gambling.

16      10.    GAN Limited is the provider of enterprise Software-as-a-Service
17  ("SaaS") solutions for online casino gaming, commonly referred to as iGaming, and
18  online sports betting applications. GAN Limited has a technology platform, which it
19  markets as GameSTACK TM internet gaming ecosystem platform. GAN Limited
20  focuses on enabling the U.S. casino industry's ongoing digital transformation. The
21  core of the GameSTACK platform is its player account management system, in which
22  highly sensitive customer and player activity data is stored and processed. This is the
23  layer of any casino operator's online technology deployment that becomes the focal
24  point of regulatory licensure since it is the kernel of player data and privacy. Dermot
25  S. Smurfit is and has been the Chief Executive Officer of GAN Limited.

26      11.    Defendant GAN NEVADA, INC. is, and at all times relevant to this
27  action was, a company existing under the laws of the state of Nevada. GAN
28  NEVADA, INC.'s headquarters are in California, together with its executive office,

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

4

leadership (including its CEO), and registered business location have been at all relevant times also in California. GAN NEVADA, INC.'s CEO is and has been Dermot Smurfit. GAN NEVADA, INC. is a wholly owned subsidary of GAN Limited where some customer service personnel are located.

12.     Plaintiffs are informed and believe, and thereon allege that Defendant DERMOT S. SMURFIT is, and at all times relevant to this action was, an individual, Chief Executive Officer and Board Member of GAN and a citizen of the State of California.

13.     Plaintiffs are informed and believe, and thereon allege that Defendant BETTY WONG is, and at all times relevant to this action was, an individual, an agent of GAN and the other Defendants, the Chief People Officer of GAN, and a citizen of the State of California.

14.     Plaintiffs are ignorant and unaware of the true names, capacities, interests, or basis for liability of Defendants identified as Does 1 through 100, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that at all times relevant to this action, Does 1 through 100, and each of them, claim certain interests or were acting as the agent, servant, alter ego, principal, employee, partner, trustee, affiliate, subsidiary, or joint venturer of each of the other Defendants in doing the things alleged herein and is responsible in some manner for the damages and disputes alleged in this Complaint. Plaintiffs will amend this Complaint to allege the true names and capacities of Doe 1 through 100 when they are ascertained.

C. **DIRECT AND VICARIOUS LIABILITY OF DEFENDANTS**

15.     Plaintiffs are informed and believe, and accordingly allege, that each of the Defendants (GAN, Smurfit, Wong, and Does 1-100) were the employer, employee, agent, servant, alter ego, principal, employee, partner, trustee, affiliate, subsidiary, or joint venturer of the other Defendants and at all times acted within the course and scope of such relationship, employment or agency or other relationship,

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

and with the knowledge and approval of said co-Defendants, and/or was involved in a joint venture or partnership with the other Defendants. In particular, at all times material hereto, GAN and Does 1-100, individually and through their officers, directors, and/or managing agents, including Smurfit and Wong, authorized the wrongful conduct alleged in this complaint and/or were personally guilty of oppression, fraud, malice and/or recklessness.

16.    Plaintiffs are informed and believe, and accordingly allege, that GAN NEVADA, INC., GAN LIMITED, and DOES 1-100, and each of them, operated the entities in such a way as to make their individual identities indistinguishable, and are, therefore, the mere alter egos of one another and/or were acting as components of a single enterprise and/or were operating as agents of each other.

17.    Defendants, and each of them, were under common ownership and control, and each of them were jointly responsible to ensure compliance with governing laws.

18.    Plaintiff's injuries and damages arise out of the organizational, management, operation and control of the entities for whom Plaintiff worked.

19.    Defendants aided and abetted each other in accomplishing the acts and omissions alleged herein. (See Restatement (Second) of Torts, section 876).

20.    Defendants operated such that their individual identities were indistinguishable from each other.

21.    The entity Defendants, and each of them, through their managers, directors, officers, and other agents, created policies and procedures, which the employees of Defendants were required to implement and follow.

22.    The entity Defendants, and each of their wrongful acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular wrongful result to the detriment of Plaintiff and Law Firm. Defendants, in concert with each other and pursuant to a common design and scheme, sought to wrongfully terminate Plaintiff for discriminatory and

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1    wrongful reasons, and to thereby cause harm to Plaintiff and otherwise deprive

2    Plaintiff of the contractual benefits to which he is entitled.

3        23.    Defendants have a unity of interest, management and ownership such

4    that the separate personalities of the Defendant entities no longer exist.

5        24.    Each of the Defendants is also an agent of the other Defendants.

6                    **GENERAL ALLEGATIONS**

7    **D.  EMPLOYMENT RELATIONSHIP AND EMPLOYMENT AGREEMENT**

8        25.    Plaintiff and Defendants had three written employment agreements,

9    including ones purporting to be binding or effective or signed as of February 22, 2021,

10   August 19, 2021, and November 1, 2021, and portions of such written agreements

11   were amended and modified, as set forth in part below.

12       26.    Plaintiff and Defendants had an initial written Employment Agreement

13   that stated it "shall become effective as of February 22, 2021." This agreement

14   provides that Arouh shall be the Senior Vice President and Deputy General Counsel

15   reporting to the then Chief Legal Officer.

16       27.    Plaintiff and Defendants had a subsequent written Amended and

17   Restated Employment Agreement that stated it "is binding as of August 19, 2021."

18   This agreement provides that Arouh shall be the Senior Vice President and Deputy

19   Chief Legal Officer reporting to the then Chief Legal Officer.

20       28.    Plaintiff and Defendants (including GAN NEVADA, INC. and its

21   Affiliates, collectively the "Company") had a subsequent written Amended and

22   Restated Executive Employment Agreement that stated it was "made as of November

23   1, 2021" (hereinafter "Employment Agreement"). The Employment Agreement

24   appears to be electronically dated November 12, 2021. This Employment Agreement

25   provides that Arouh shall be the Chief Legal Officer and report directly to the

26   Company's Chief Executive Officer, who was Dermot S. Smurfit at all relevant times.

27   The GAN board of directors ratified Arouh's appointment as Chief Legal Officer and

28   Corporate Secretary of GAN. Arouh served as GAN's Chief Legal Officer and

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

7

Corporate Secretary.

29.     In a panic, on November 12, 2021, the Company (by and through its managing agent) called Arouh via telephone while Arouh was driving, apprising him that it was critical that Arouh enter into a new employment agreement within the next hour since Arouh's employment agreement had to be published within the hour with the Company's Form 10-Q that was being filed with the Securities and Exchange Commission and would therefore be available publicly. At that time (November 12, 2021), the Company only had an employment agreement with Arouh relating to him serving as the Deputy Chief Legal Officer, not the Chief Legal Officer. Since Arouh and GAN had not yet agreed on the standard employment agreement that all members of the Executive Leadership Team would enter into (which included the CEO, CFO, CLO (Arouh) and President of Enterprise Solutions) and since Arouh made clear to Smurfit that Arouh had not even received the current draft version of the employment agreement that was being prepared by the Human Resources Department, the CFO's office, and outside counsel, Smurfit promised that if Arouh signed "any draft of the ELT [(Executive Leadership Team)] form employment agreement that's around, the company will amend it supplementally to include all additional beneficial terms negotiated in your [(Arouh's)] then existing employment agreement as Deputy CLO and to include all additional beneficial terms applicable to any other member of the ELT, which will automatically apply to you [(Arouh)] until your agreement is formally amended." Then, later on November 12, 2021, and just prior to the stated Company filing deadline, the CFO's office sent a signature page for Arouh to sign via DocuSign. Arouh pulled his car over to the side of the road, and, although he had not had an opportunity to review the agreement, Arouh pushed a button on the DocuSign program that said he "signed" the unread draft employment agreement in reliance on Smurfit's promise. The Company filed the Form 10-Q shortly thereafter.

30.     The Employment Agreement was verbally modified by Smurfit after November 12, 2021, in various respects, including but not limited to a base salary

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

increase from $290,000 to $350,000, effective retroactively to the beginning of that month.

31.     The Employment Agreement was further verbally modified by Smurfit as reported by GAN's then authorized Chief Financial Officer in December 2021 (prior to Arouh's termination). GAN verbally agreed to issue Arouh Restricted Stock Units worth $60,000. The agreement to issue such RSUs was not qualified or restricted in terms of vesting.

32.     The Employment Agreement provided Plaintiff with a compensation package for his services as Chief Legal Officer if Defendants terminated Plaintiff without cause, and also drastically reduced the compensation package if Defendants terminated Plaintiff with cause.

33.     The Employment Agreement defined Affiliate at paragraph 5(b) to mean, with respect to any Person, any Person that controls, is controlled by or is under common control with such Person or an Affiliate of such Person.

34.     The Employment Agreement defined "Person" to mean, in part, an individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization, investment fund, and any other business entity.

35.     Each of the Defendants are within the definition of the Company in the Employment Agreement.

36.     The Employment Agreement between Defendants and Plaintiff, Paragraph 7(d), provides in material part that an executive that is terminated *without cause* is entitled to: (i) Accrued Payments; (ii) a cash severance payment in an amount equal to one (1) times the sum of Executive's then-current Base Salary, payable in a lump sum within 10 Calendar days of the Termination Date, (iii) the Pro Rata Bonus; (iv) the Pro Rata Acceleration; and (v) on a monthly basis, for a period of twelve (12) months, the Company's monthly share of premiums required to continue Executive's and Executive's dependents group health insurance benefits (medical, dental, and

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  vision) after the Termination Date under the applicable provisions of COBRA.

2  37.  Paragraph 7(a) of the Employment Agreement states, in part, that "The
3  Company may, at any time and without notice, terminate Executive's [(Plaintiff's)]
4  employment with the Company for Cause. In the event the Company terminates
5  Executive's [(Plaintiff's)] employment for Cause, the Company shall provide only
6  Accrued Payments to Executive; the Company shall not provide Executive any
7  unearned Target Bonus or unvested Equity Awards."

8  38.  Paragraph 5(b) of the Employment Agreement states, in relevant part,
9  that "Cause" is any of the following conduct by executive:

10  (vii.)  "[I]ntentional and willful misconduct that may subject the
11  Company to criminal or civil liability."

12  (x) "[F]ailure to cooperate in any investigation by the Company or with
13  any investigation, inquiry, hearings, or similar proceedings by any
14  governmental authority having jurisdiction over the Company or its
15  Subsidiaries or Affiliates."

16  (xi) "[B]eing found unsuitable for, or having been denied, a gaming
17  license, or having such license revoked by a gaming regulatory
18  authority in any jurisdiction in which the Company or any of its
19  subsidiaries or affiliates conducts operations."

20  (xii) "[W]illful or material misrepresentation to the Company or to the
21  Board relating to the business, assets or operations of the
22  Company."

23  39.  The Employment Agreement provides, in part, at Paragraph 14(b), under
24  the heading Non-Disparagement, that "Both during and after Executive's employment
25  with the Company, the Board, President and Executive Vice Presidents (collectively,
26  the "Company Representatives") shall refrain from any disparagement, defamation,
27  libel or slander of any of Executive [sic]. Nothing in this Section 14(b) shall prohibit
28  the Company Representatives from discussing with third parties, including, but not

10

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

limited to, reference requests from Executive's future employers, regarding: (i) Executive's date of employment; [sic] (ii) the status of Executive's employment with Company, if any at the time. Furthermore, nothing in this Section 14(b) shall prohibit the Company Representatives from engaging in internal discussions within the Company regarding Executive's performance or the satisfaction or execution of Executive's duties, responsibility, obligations, or authority."

40.    The Employment Agreement provides, in part, at Paragraph 11(a), titled "Non-Competition" that Executive agrees for one year following the Termination Date, Executive "will not, directly or through others, whether as an owner, director, officer, manager, consultant or employee: (i) provide services for the benefit of any Restricted Business within the United States . . .."

41.    The Employment Agreement provides, in part, at Paragraph 11(b), titled "Non-Compete Consideration; Waiver" that "In exchange for Executive's non-compete restriction during the Covenant Period, the Company shall continue to pay Executive's Base Salary during the Covenant Period ('Garden Leave Compensation')."

42.    The Employment Agreement provides, in part, at Paragraph 21, titled "Fees and Costs" that "[i]n the event that either Party brings an action to enforce or affect its rights under this Agreement, the prevailing Party shall be entitled to recover its costs and expenses, including the costs of mediation, litigation, court fees, and reasonable attorneys' fees incurred in connection with such an action…."

43.    The Employment Agreement provides that California law shall apply without references to conflict of law principles.

44.    Defendants breached the Employment Agreement in a variety of respects, including but not limited to the following: (a) wrongfully terminating Plaintiff for cause; (b) refusing to pay Plaintiff the benefits under the Employment Agreement, including but not limited to Paragraphs 7(d) (for termination without cause) and 11(b) (Garden Leave Compensation); and (c) disparaging, defaming,

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  slandering and libeling Plaintiff under the Employment Agreement, Paragraph 14(b).

2  **E.  BREACH OF EMPLOYMENT AGREEMENT – DEFENDANTS HAD NO**

3  **"CAUSE" TO TERMINATE PLAINTIFF**

4  45.    Defendants had no "cause," as defined by the Employment Agreement,

5  to terminate Plaintiff. Accordingly, Plaintiff was entitled to the benefits under

6  Paragraph 7(d) (for termination without cause) and Paragraph 11(b) (Garden Leave

7  Compensation) of the Employment Agreement.

8  46.    On December 9, 2021, at approximately 9:00 a.m. Pacific Time,

9  Defendants, including Smurfit and Wong, had a call with Arouh and advised Arouh

10  that he was terminated from the Company effective immediately. Smurfit stated that

11  Arouh was terminated for two reasons: (i) failing to pay the taxes, and (ii) failing to

12  gain approval for the Pennsylvania gaming license.

13  47.    Defendants thereafter sent a letter to Arouh dated December 9, 2021,

14  wherein Defendants purported to base Arouh's termination on entirely different,

15  fabricated grounds: for "cause" under the Paragraph 5(b) (vii), (x), (xi) and (xii) of

16  the Employment Agreement (the "December 9, 2021 Termination Letter"). None of

17  the sections referenced by Defendants support the purported for-cause termination.

18  48.    Defendants Termination Letter purported to cite Paragraphs 5(b)(vii),

19  (x), (xi), and (xii) of the Employment Agreement as cause for Plaintiff's termination.

20  As a factual matter, none of these grounds exist.

21  49.    Despite the Termination Letter's reference to Paragraph 5(b)(vii) of the

22  Employment Agreement (which states that "cause" is: "intentional and willful

23  misconduct that may subject the Company to criminal or civil liability"), Defendants

24  have identified no intentional and willful misconduct on the part of Arouh that would

25  subject the Company to criminal or civil liability, and indeed there is none.

26  50.    Despite the Termination Letter's reference to Paragraph 5(b)(x) of the

27  Employment Agreement (which states that "cause" is: "failure to cooperate in any

28  investigation by the Company or with any investigation, inquiry, hearings, or similar

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

proceedings by any governmental authority having jurisdiction over the Company or its Subsidiaries or Affiliates"), Defendants have identified no failure on the part of Arouh to cooperate in any investigation, inquiry, hearings, or similar proceeding over the Company, and indeed there is none.

51.    Despite the Termination Letter's reference to Paragraph 5(b)(xi) of the Employment Agreement (which states that "cause" is: "being found unsuitable for, or having been denied, a gaming license, or having such license revoked by a gaming regulatory authority in any jurisdiction in which the Company or any of its subsidiaries or affiliates conducts operations"), Defendants have failed to identify any factual predicate that would support a termination under Paragraph 5(b)(xi). To the contrary, prior to Defendants' termination of Arouh, Arouh was never "found unsuitable for" or "denied" a gaming license. GAN filed a petition to withdraw Arouh's application for a gaming license weeks after GAN terminated Arouh.

52.    Indeed, prior to GAN's termination of Arouh, GAN knew that Arouh had paid the taxes at issue and timely submitted his application to the gaming regulators by the December 10, 2021 deadline. That is, GAN's Susan Vincent (who was GAN's representative interfacing with the regulators regarding Arouh's application) was in possession of the documents requested by the regulators to support Arouh's application, including copies of Arouh's bank check showing payment in full of the taxes at issue and evidence that the bank check was previously sent by certified mail, prior to GAN's termination of Arouh.

53.    Arouh had complied with the gaming regulator's process requirements prior to the December 10, 2021 deadline when Arouh spoke with Smurfit on December 9, 2021. Regardless, the regulators' December 10, 2021 deadline had not passed when Smurfit told Arouh on December 9, 2021 at 9 a.m. Pacific Time that he was terminated immediately.

54.    More significantly, the regulators never made a determination that Arouh was unsuitable for a gaming license. The regulators never denied Arouh a gaming

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1  license. The regulators never made such a determination or denial before or after

2  December 9, 2021, the date of the December 9, 2021 Termination Letter.

3      55.    GAN falsely stated in its December 9, 2021 Termination Letter that

4  Arouh was terminated pursuant to Paragraph 5(b)(xi) for "cause" (based on the

5  regulators denying Arouh a gaming license or finding him unsuitable for a gaming

6  license). GAN's statement is patently false as evidenced by GAN's own sworn

7  testimony to the regulators. On January 3, 2022, GAN, through its attorney acting as

8  GAN's authorized agent appearing before the Pennsylvania Gaming Commission

9  Board, Stephen D. Schrier, Esq., of Blank Rome LLP, filed a Petition on behalf of

10  GAN with the Pennsylvania Gaming Commission Board for "Withdrawal of License

11  Application of Michael B. Arouh." The mere fact that GAN had to withdraw the

12  license application of Arouh evidences that fact that the gaming commission never

13  denied the application.

14      56.    On February 1, 2022, the Pennsylvania Gaming Commission Board filed

15  an answer to GAN's Petition for Withdrawal of License Application of Michael B.

16  Arouh, in which the PGCB states: "It is admitted, <u>by way of information received</u>

17  <u>from Petitioner [(GAN)]</u> and believed, that withdrawal of Arouh's license application

18  was not due to any disqualifying conduct." (emphasis added). The PGCB further

19  stated that: "BIE [(PGCB's Bureau of Investigations and Enforcement)] and Board

20  staff have found no adverse or unusual circumstances surrounding the request to

21  withdraw the Principal License application of Arouh." (emphasis added).

22      57.    Despite the Termination Letter's reference to Paragraph 5(b)(xii) of the

23  Employment Agreement (which states that "cause" is: "willful or material

24  misrepresentation to the Company or to the Board relating to the business, assets or

25  operations of the Company"), Defendants have failed to identify any willful or

26  material misrepresentations by Arouh to the Company or the Board relating to the

27  business, assets or operations of the Company, and indeed there are none.

28      58.    Defendants' four referenced sub-paragraphs of the Employment

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  Agreement provide zero justification for Defendants to terminate Arouh for cause.

2  Furthermore, prior to filing suit and despite formal request, GAN failed to produce

3  any records providing justification for the termination grounds stated in the

4  Termination Letter. On March 4, 2022, GAN responded to Arouh's Labor Code

5  Section 1198.5 request for such records (including Arouh's personnel file and

6  "records related to an employee's performance and to any grievance concerning the

7  employee, including any reason an employee's employment has been terminated"),

8  and GAN did not produce any documents supporting its alleged "cause" for

9  termination. Indeed, despite being required to produce such documents pursuant to

10 Labor Code 1198.5: (a) GAN failed to produce any document from the Pennsylvania

11 Gaming Commission Board denying Arouh a license; (b) GAN failed to produce any

12 Board resolution or minutes regarding the for-cause basis of Arouh's termination as

13 an officer of Defendants; and (c) Defendants failed to produce their petition to the

14 Pennsylvania Gaming Commission Board, which evidences Arouh was not

15 terminated for cause. GAN's failure to produce documents supporting its for-cause

16 termination in response to its legal requirement under Labor Code Section 1198.5 is

17 an admission that no such documents exist, and GAN lacked the basis to terminate

18 Arouh for cause.

19     59.   Defendants' attempt to characterize the termination as a for-cause

20 termination without legitimate factual predicate under the Employment Agreement

21 Paragraph 5(b) evinces Defendants' bad faith and pre-textual motivation for firing

22 Arouh.

23     60.   Specifically, none of the following reasons for terminating Arouh

24 constitutes "cause" for termination as defined in the Employment Agreement:

25         a.    Arouh's objections to and refusal to engage in the hostile work

26               environment at GAN based on gender, age, ethnicity, national

27               origin, religion and sex;

28         b.    Arouh's age (over 40), religion (Jewish), and sex (male);

15

c.  Arouh's insistence on following his legal duties and his unwillingness to bend the law for Defendants;

d.  Arouh's objections to a GAN employee doing non-GAN work (e.g., work on Smurfit's special purpose acquisition company ("SPAC")) because it was outside his legal duty;

e.  Arouh's refusal to approve a $1 million loan to Smurfit because it was not consistent with his legal duty;

f.  Arouh's opinion that Smurfit violated CDC Covid guidelines and Smurfit laughing about exposing senior executives at competitor Playtech to Covid;

g.  GAN's misrepresentations to Arouh and the public about being Chief Legal Officer; and

h.  GAN's objection to the race of a new employee hired by Arouh, and GAN's ultimate revocation of an employment offer that Arouh made to a Black attorney.

## F.  BREACH OF EMPLOYMENT AGREEMENT – CONTRACT DAMAGES IF TERMINATED WITHOUT CAUSE

61.  Defendants failed to pay Plaintiff all wages due under his Employment Agreement.

62.  Under the Employment Agreement, Paragraph 11(b), Executive is entitled to Garden Leave Compensation of payment of Executive's Base Salary during the Covenant Period (as defined in the Employment Agreement).

63.  Pursuant to California Labor Code section 203, Defendants owe Plaintiff waiting time penalties.

64.  Defendants agreed to gross-up Plaintiff on the Long-Term Incentive Restrictive Stock Units promised in the 4Q 2021 for retention purposes. Defendants agreed that Plaintiff's November 12, 2021 spot bonus would be valued the same as the other executives.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

65. Per the Employment Agreement, but for the wrongful termination, Arouh would be eligible to earn a Transaction Bonus if there is a change in control.

66. If Arouh had been terminated without cause (for non-tortious reasons), pursuant to the Employment Agreement, Arouh would be entitled to damages, including but not limited to the following at a minimum, plus pre and post judgment interest, and attorney's fees:

(a) Accrued Payments;

(b) Severance payment of one times the Executive's then-current Base Salary, which was $350,000;

(c) Pro Rata Bonus in an amount equal to the Target Bonus for the year in which the Termination Date occurs ($350,000) multiplied by a fraction the numerator of which is the number of days in the applicable year through the Termination Date and the denominator of which is 365. Thus, the fraction would be 344/365= 0.9425. This results in a pro rata bonus worth $329,875.

(d) Pro Rata Acceleration, which entitles Arouh to the following as vested Restrictive Stock Units:

(i) November 12, 2021 Long Term Incentive (LTI) (150% of Base Salary, $290,000): 30,450 RSUs settling into ordinary shares in four equal annual installments, with the first installment settling on October 18, 2022: 30,450 RSUs x days between 11/12/2021 and 12/11/2021 = 30 days, divided by 341 days, divided by 4 = 670 RSUs.

(ii) 2021 LTI Agreed to Gross-up (150% of Base Salary, retroactively increased back to November 1, 2021 by $60,000 to $350,000). $90,000 (value of RSUs) divided by $6.81 (as of January 21, 2022)= 13,216 total RSUs divided by 4 = 3,304 RSUs awarded per year. 30 days (difference

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

between 11/12/2021 and 12/11/2021) divided by 293 days (based on 8/31/2022 vesting) x 3,304 =350 RSUs.

    (iii)   November 12, 2021 Special Gross-up Grant: 20,300 RSUs all vest 8/31/2022.

    (iv)   30 days (difference 11/12/2021-12/11/2021) divided by 293 days (difference between 11/12/21 and 8/31/22) x 20,300= 2,079 RSUs.

(e)    On a monthly basis, for a period of twelve (12) months, the Company's monthly share of premiums required to continue Executive's and Executive's dependents group health insurance benefits (medical, dental, and vision) after the Termination Date under the applicable provisions of COBRA.

(f)    Vacation Pay of $29,166.67 (20.07 days/$350,000).

(g)    Garden Leave Compensation of $350,000 per Employment Agreement paragraph 11(b) and verbal increase of salary from $290,000 to $350,000.

(h)    Expense reimbursement of $15,830.91 per Employment Agreement paragraph 7.(v) ("payment of any outstanding reimbursable business expenses submitted to the Company in accordance with the Company's policies and procedures"), which Defendants, including Smurfit, advised Arouh had been approved by Smurfit.

(i)    Waiting time penalties on unpaid wages. Public policy has long favored the full and prompt payment of wages due an employee. To ensure that employers comply with the laws governing the payment of wages when an employment relationship ends, the Legislature enacted Labor Code Section 203 which provides for the assessment of a penalty against the employer when there is a

18

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

willful failure to pay wages due the employee at conclusion of the employment relationship. Assessment of the waiting time penalty does not require that the employer intended the action or anything blameworthy, but rather that the employer knows what he is doing, that the action occurred and is within the employer's control, and that the employer fails to perform a required act. The penalty is measured at the employee's daily rate of pay and is calculated by multiplying the daily wage by the number of days that the employee was not paid, up to a maximum of 30 days.

(j)    Additional damages for breaches of Paragraphs 14(b) and 21 of the Employment Agreement.

## G.  WRONGFUL TERMINATION – DEFENDANTS WRONGFULLY TERMINATED PLAINTIFF IN VIOLATION OF PUBLIC POLICY

67.    Defendants wrongfully terminated Plaintiff in violation of public policy. Substantial factors in Defendants' termination of Arouh were that: (a) Arouh objected to and refused to engage in a hostile work environment at GAN based on race, gender, sex, age, ethnicity, national origin, and religion; (b) Arouh was an over 40, Jewish man; and (c) Arouh insisted on following his legal duties, and made whistleblower complaints when asked to be "flexible" with his legal duties and otherwise "bend the law" for Defendants.

68.    Plaintiff further alleges, on information and belief, that GAN and the Defendants produced a derogatory video, which it widely circulated as being humorous, and that the video sought to exploit extremely negative stereotypes regarding Asians, particularly Chinese people and Japanese people, and women. The video, among other things:

(a)    mocked the accent of Asians and goaded a GAN employee to, in effect, "say something in Chinese, it sounds funny;"

(b)    showed a delivery of Chinese food by an Asian GAN employee,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

with demeaning commentary; and

(c)    contained offensive sexual innuendo in which a GAN employee likened a container that was dripping wet to a woman being "wet" on the bottom.

69.    Arouh found the video offensive and objected to it.

70.    Jevgeni Kapparov, a white Senior Director of Technology with 16 years of professional experience, is shown in another GAN video harassing Hiroki Takahashi, a Japanese Software Engineer with just six years of professional experience.

71.    The following callouts demonstrate the essence of exchanges between the white senior employee (shown on the left) and the far more junior Japanese employee (shown on the right) as shown on the video that will be provided supplementally.



72.    The offensive videos did not contain any statement by Defendants whatsoever that the content of the video was unacceptable.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

73.     The offensive video was not forwarded by Defendants with any statement saying that the content of the video was unacceptable. In fact, it was first distributed by a C-Suite employee and a member of GAN's Board of directors with a note that in essence said, "drop what you're doing and watch this, it is funny."

74.     Senior GAN employee Evelin Simer distributed the video by email, along with others, including GAN's Executive Committee (members were Dermot S. Smurfit, Karen Flores, Don Ryan, Anders Karlsen, Si Knock, and at the time, Arouh). GAN's Executive Committee discussed both of those videos via email.

75.     The videos were and presumably still are in the possession, custody and control of Tim Rushton, Director, Security & Infrastructure at GAN.

## H.   WRONGFUL TERMINATION AGAINST PUBLIC POLICY – GAN DISCRIMINATORY AND HOSTILE CONDUCT BASED ON SEX AND GENDER (AND IRANIAN NATIONAL ORIGIN)

76.     GAN had a hostile work environment based on gender and sex.

77.     GAN (including top executives and board members of GAN) created and/or circulated at least two offensive videos containing sexual innuendo, engaged in rants replete with sexual innuendo and misogynistic comments, discussed hiring hookers for oral sex, disparaged the looks of a female consultant, talked about f**king female consultants, surreptitiously took a picture of a colleague and joked about her being a girlfriend and revoked an employment offer that Plaintiff made to a female of child-bearing age.

78.     The above-referenced GAN-produced derogatory video, approximately five-minutes in length, that was widely circulated as purportedly being humorous, was sexually suggestive and exploitive of women. The video, among other things, depicted a food delivery person holding a dripping bag of food and saying words to the effect of "careful, it is wet on the bottom" and then the GAN supervisor grins and responds "that's what my wife says."

79.     Another GAN video, approximately 2 minutes in length, that was

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

circulated for humor purposes at GAN, purports to marginalize women and depicts a woman being bribed with food. The video purports to depict the female head of a GAN subsidiary dressed as the company mascot, repeatedly saying no to a request for permission to act, and then being bribed with a cookie and changing her response to yes.

80.    At GAN, business discussions were repeatedly laced with misogynistic and rampant sexualized language. For example,

a.    "We're f**king each other hard."

b.    "Let's open up the Kimono."

c.    "We pulled up our skirts."

d.    "She was a fat, smelly pig that filled-up my HR department with fat pigs that will unfortunately take some time for a new girl to fire."

81.    At a GAN party in Las Vegas, GAN employees engaged in conduct that created a hostile work environment based on sex, gender, and national origin (Iran). Several GAN employees tried to collect money to pay for a prostitute to perform oral sex in the bathroom on another GAN employee, and they made a series of disparaging comments about women and sex. At the GAN party in Las Vegas, GAN employees openly joked about a fellow employee (Kamran Charles Kamjou), who they perceived as Iranian. The GAN employees discussed hiring a woman who Mr. Kamjou was talking to to take him to the bathroom to perform oral sex on him. The GAN employees believed the woman was a prostitute. The GAN employees made disparaging comments such as: "like even a f**king hooker would actually be willing to f**k an Iranian." Arthur Barker, Managing Director at GAN, would have knowledge of this incident.

82.    On another occasion, a GAN employee spoke disparagingly about a female consultant (Melissa Blau) who works for some of GAN's customers. The GAN employee in question told an assembled group of GAN employees: "I would've

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

f**ked Melissa Blau based on her zoom profile picture, but now that I see what she looks like . . ., what's her picture like 20 f**ing years old?"

83. Also regarding GAN's consultant Melissa Blau, a GAN employee disparagingly said: "who knew GAN's 'MB Protocol' meant 'don't f**k Melissa Blau!'"

84. Another GAN executive circulated a surreptitiously taken cell phone picture of consultant Melissa Blau at a party, and sent a special encrypted message GAN executives used to communicate to Smurfit and GAN's Chief Commercial Officer Jeff Berman, who is married, which said: "Hey Jeff, your girlfriends [sic] here looking for you." Melissa Blau is not Jeff Berman's wife.

85. Plaintiff is informed and believes, and thereon alleges, that GAN's Chief Technology Officer failed to properly report to the CLO other alleged sexual misconduct from GAN's largest customer, FanDuel.

86. GAN (Mr. Smurfit) also overruled Arouh's pre-termination offer to hire a female attorney ("C.M.") in the legal department presumably once Smurfit realized that she was a woman of child-bearing age and Smurfit had the opportunity to do so.

87. Others with knowledge of the misogynistic and rampant sexualized language would include: Smurfit, Hannah Swales (then Head of Strategy at GAN), Joann Pierce (then Vice President of Sales and Operations at GAN, i.e. "Development is incompetent; we can't deliver. [Major new Nevada client] is a cluster f*ck. This is a f*cking train wreck and it's really frustrating. We're just a cluster f*ck. I know I'm a walking f*cking HR violation, Michael; sorry."); Danielle Parsons (then Sr. Director, Product Partnerships at GAN, i.e.: "This place is a cluster f*ck and we're banging ourselves hard"); Justine Clay (then Sr. Director Customer Success at GAN); Arthur Barker (then Managing Director at GAN), Claire Bailiss (Director -- HR at GAN), Tom Ustunel (then Chief of Gaming Operations at GAN), and Gwenevere Crary (then head of GAN HR).

## I. <u>WRONGFUL TERMINATION AGAINST PUBLIC POLICY – GAN DISCRIMINATORY AND HOSTILE CONDUCT BASED ON RACE</u>

88.    GAN had a hostile work environment based on race. Arouh found it offensive.

89.    On information and belief, Plaintiff alleges that Defendants were motivated in substantial part to wrongfully terminate him based on a hostile work environment based on race and Arouh's decision to hire a Black attorney.

90.    GAN's executive leadership bragged that a GAN director was the "perfect director" because she is a Black woman, and therefore satisfies California's then recently enacted diversity requirements for Boards, but "she doesn't look Black."

91.    Here is a picture from the GAN website of the Black female director in question that GAN used to present Ms. Bracey, as color managed by GAN:



92.    GAN and Smurfit also overrode and rescinded Arouh's pre-termination offer to hire a Black attorney ("B.B.") in the legal department once Smurfit realized the attorney was Black (notwithstanding that Arouh had unilateral authority to hire an attorney into the legal department and all 5 executives that interviewed B.B. rated him

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

"excellent"). Tellingly, Smurfit fired Arouh approximately 48 hours after Arouh made the Black attorney B.B. an offer of employment to work at GAN.

93.     GAN's executive leadership wanted to increase its racial/ethnic diversity index because GAN had to report that racial/ethnic diversity in various ways, which meant increasing certain races where it would get "credit" for doing so, particularly at the executive level which was all white. To do so, GAN wanted to replace Arouh, who is a Jewish white male, and for whom GAN got no credit, with Sylvia Tiscareño, who is Mexican female, for whom GAN did get "double" credit (because she was both a Mexican and a woman). Shortly before Arouh was replaced, at the chief people officer position GAN replaced Gwenevere Crary, who is white, with Betty Wong, who is Asian.

## J.  WRONGFUL TERMINATION – AGAINST PUBLIC POLICY – GAN DISCRIMINATORY AND HOSTILE CONDUCT TO PEOPLE OVER 40

94.     A substantial factor in Defendants' wrongful termination of Plaintiff was based on Plaintiff being over 40 years old.

95.     GAN had a hostile work environment based on age. Defendants made repeated, unwanted comments about Arouh being old. Defendants' repeatedly used "baldness" as a proxy for being over 40 years old.

96.     After supplying to GAN's human resources department the below-requested head-shot for GAN's web site, GAN's Head of Human Resources stated to Arouh "Michael, the picture you sent is cropped-off on the top; you know, it's OK if you're bald."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx



**Michael Arouh**
Chief Legal Officer & Corporate Secretary
Read More

97.    Smurfit repeatedly emphasized Arouh's age in videocalls, and while on group video calls with others directed Arouh to "adjust your camera, Michael, so we can see your bald head" to emphasize Arouh's baldness due to age.

98.    Smurfit is almost 10 years younger than Arouh. Smurfit, who has a full head of hair, wears a pony-tail and often tucks it in the back of his shirt, such as in the following picture:

99.    At a dinner attended by members of GAN's board of directors and GAN's Executive Leadership Team, Seamus McGill, the Chairman of the Board of Directors, commented to the table about the model-like hair-cut of Jeff Berman, the Chief Commercial Officer who was at the table, "hey Jeff, that's some hair cut you have." Here is a picture of Mr. Berman's haircut.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271



**Jeff Berman**
Chief Commercial Officer
Read More

100.   That board member immediately followed-up that statement by laughing out loud, with a loud proclamation: "of course, Michael, that's not something *you* have to worry about," emphasizing Arouh's age by referring to Arouh's bald head shown here.

[photograph]

101.   During the loud laughter from around the table, Arouh interrupted his conversation with Karen Flores, a GAN board member and GAN's Chief Financial Officer, rolling his eyes at Flores and then looking over to meet board member McGill's threatening, glaring stare, which was challenging Arouh.

102.   Due to McGill's violent history, Arouh was scared to vehemently object to the offensive age-related comments lest McGill react violently or use his power over Arouh's compensation and employment to retaliate (McGill was Chairman of the Board of Director's Compensation Committee). Arouh knew McGill had been drinking heavily that evening (drinks at a work-related event that day, cocktails at a bar before dinner, and yet more cocktails and wine before and during dinner). Arouh was aware of McGill's reputation for violence and rage. Arouh had heard McGill got

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

in physical fights and punched people. Arouh had heard McGill had been arrested for a bar-fight.

103.    Arouh tried to object and defend himself by saying that "lawyers are supposed to look like lawyers, not like they came out of central casting." Notwithstanding Arouh's protestations to the offensive age-related comments, the younger and full-headed McGill kept barbing Arouh with comments about baldness. McGill has a full head of hair, shown here:



104.    McGill's age-related comments about Arouh humiliated him. Arouh is informed and believes, and on that basis alleges, that Arouh being over 40 was a substantial factor in McGill terminating him.

105.    Arouh is informed and believes that none of the others on the Executive Leadership Team were as old as Arouh, and none of the others were bald. GAN's then public Executive Leadership Team is shown here.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx



106.   Don Ryan, GAN's Chief Operating Officer, sitting to Arouh's right at the dinner table, was the only other person at the table approaching Arouh's age, and he clearly recognized Arouh's discomfort at the age-related appearance comments, and said "I'm not touching that topic."

107.   The other Board Members and Executive Leadership Team members who were at the table had the opportunity to shut down McGill's negative age-related comments, but they failed to do so. Rather, GAN leadership sat silently listening and ratifying the Chairman of the Board of Director's negative comments about Arouh's baldness/age. GAN's managing agents who were present did not tell McGill to stop talking about old bald men, they did not rebuke McGill, and they did not otherwise tell Arouh that GAN did not agree with McGill's comments. Rather, they laughed along and ratified McGill's offensive age-related comments. The age-related comments were unwelcome and pejorative, and created an intimidating, hostile, degrading, humiliating or offensive environment based on being over 40.

29

108.   On information and belief, Plaintiff alleges the following would have knowledge of age discrimination and hostile work environment based on age: Smurfit, Jarrod Lorenzo (formerly Senior Manager Financial Planning & Analysis at GAN), Betty Wong, and Gwenevere Crary (formerly head of GAN HR).

## K.   WRONGFUL TERMINATION AGAINST PUBLIC POLICY – GAN DISCRIMINATORY AND HOSTILE CONDUCT BASED ON RELIGION

109.   A substantial factor in Defendants' wrongful termination of Plaintiff was based on Plaintiff being Jewish.

110.   GAN had a hostile work environment based on religion. It was an anti-Semitic environment. Defendants made repeated comments that favored certain mainstream religions, and disparaged others, including Judaism. Customers negotiating a lower price were repeatedly referred to as "Jewing it down." In great contrast, Smurfit, who is Irish, treated St. Patrick's day as though it was the world-wide high holiday, distributing, along with other members of GAN's Executive Leadership Team, via special encrypted messaging and texts, messages and images of leprechauns, clovers, and green everything, including a buxom woman holding a green beer saying "cheers."

111.   Arouh found it offensive.

112.   On information and belief, persons with knowledge of the anti-Semitic GAN environment include Smurfit, David Goldberg (GAN Board member), and Jeff Berman (then Chief Commercial Officer at GAN).

## L.   DEFENDANTS TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AND AROUH'S CAREER IN GAMING INDUSTRY

113.   For Arouh to find another job as a Chief Legal Officer in the gaming industry, or otherwise work as a key person in the gaming industry, it is necessary to obtain a Casino Key Employee License. The License requires completion of the Multi-Jurisdictional Personal History Disclosure Form. Question 16(b) of that

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Disclosure Form asks: "[W]ere you ever charged with any infraction in relation to any employment which was the subject of any disciplinary action? REASON FOR DISCIPLINARY ACTION."

114.   The sum and substance of Defendants' December 9, 2021 Termination Letter, that was purportedly for "cause," would be a required disclosure for Arouh to get a Key Employee License.

115.   The December 9, 2021 Termination Letter, and GAN's false statements of causation therein, would be used by the gaming commissions to deny Arouh a gaming license. Defendants were contacted by Arouh in February 2022 to correct that; Defendants refused. It is imperative that GAN be forced by court order to withdraw the "for cause" basis of its December 9, 2021 Termination Letter because it is false and the false statement, in and of itself, constitutes tortious interference with Arouh's prospective economic advantage.

116.   GAN's false statement of a for-cause termination effectively bars Arouh from finding a replacement position as a Chief Legal Officer in a public company or an equivalent position in a public or private company given the scrutiny that such positions entail.

117.   Arouh was interviewing to get a new job to assume the Chief Legal Officer role of a $1 billion public company where a Key Employee License would be required.

118.   On information and belief, Defendants (including but not limited to GAN and Smurfit, as well as Defendants' managing agents McGill and Tiscareño) made statements (written and/or oral) on and after December 9, 2021, whereby Defendants wrongfully impugned Arouh's good character, honesty and integrity, and stated publicly that he was terminated and, in effect, stated that Arouh was terminated for cause because, in essence, he was terminated for the reasons stated in the December 9, 2021 Termination Letter. Specifically, on information and belief, Defendants falsely stated that Arouh: (a) intentionally and willful engaged in misconduct that may

31

1  have subject the Company to criminal or civil liability; (b) failed to cooperate in any
2  investigation by the Company or with any investigation, inquiry, hearings, or similar
3  proceedings by any governmental authority having jurisdiction over the Company or
4  its Subsidiaries or Affiliates; (c) was found unsuitable for, or was denied, a gaming
5  license; and/or (d) made a willful or material misrepresentation to the Company or to
6  the Board relating to the business, assets or operations of the Company. Further, on
7  information and belief, Plaintiff alleges that Defendants sent an email to an individual
8  who was not a GAN employee disclosing the nature of Arouh's February 2, 2022
9  letter to GAN that set forth GAN's purported grounds for termination of Arouh for
10  cause.

11      119.    Further, on information and belief, Plaintiff alleges that Defendants and
12  their agents McGill and Tiscareño, breached the Employment Agreement and sought
13  to tortiously interfere with Plaintiff's prospective economic advantage, and/or tamper
14  with prospective witnesses, by contacting certain individuals, including individuals
15  who were not employees of GAN, asking those persons to speak with GAN "off the
16  record" about Arouh. Such individuals were references for Arouh, referral sources for
17  Arouh, and persons with whom Arouh was seeking new employment. Defendants'
18  actions undermined Plaintiff's efforts to get another job and tampered with Extti's
19  investigation of GAN.

20      120.    For the reasons alleged above, GAN's identification of "cause" in its
21  December 9, 2021 Termination Letter was false. Defendants' reiteration of the for-
22  cause termination of Arouh was both a breach of contract and tortious interference.

23      121.    Plaintiff is also informed and believes, and thereon alleges, that GAN
24  published a written statement available on the internet on or about December 22, 2021
25  that "Michael Arouh's . . . employment with GAN was terminated…"

26      122.    This written announcement to the world of its termination of Plaintiff
27  was wrongful disclosure of confidential information in violation of the Employment
28  Agreement. Such disclosure was not legally required. Such disclosure was damaging

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

32

to Plaintiff.

123.    GAN's wrongful and false uncorrected disclosures interfered with Arouh's obtaining a replacement job. In 2022, Arouh interviewed with a public company in the gaming industry to find a new job as a Deputy Chief Legal Officer to then become the Chief Legal Officer upon the imminent retirement of that company's existing Chief Legal Officer. At the interviewing company's expense, Arouh flew to meet with the executive leadership team. After a series of successful interviews in which the senior executive of that gaming company said that Arouh is "awesome" and to "hire him," Arouh had a follow-up meeting with the CEO. While sitting in the CEO's office in the follow-up meeting, the CEO asked if Arouh wanted the job, but then the CEO asked Arouh, "So all I'm concerned about is that it says in GAN's SEC filing that you were terminated, and what I'm concerned about is that you were engaged in some kind of fraud over there; I mean, it's unusual to have a lawyer be terminated from a company, right? How do I know you weren't engaged in some kind of fraud over there?"

124.    GAN has prevented Arouh from being able to reassure interviewing companies that Arouh did not do anything wrongful because Arouh cannot ignore the existence of GAN's false statements and disclosures. For example, GAN's false statements that Arouh was terminated for cause, including its false statements that Arouh was, in essence, terminated because he engaged in the following, is a death-knell to Arouh's finding a replacement job of similar caliber: (a) intentional and willful misconduct that may subject the Company to criminal or civil liability; (b) failure to cooperate in any investigation by the Company or with any investigation, inquiry, hearings, or similar proceedings by any governmental authority having jurisdiction over the Company or its Subsidiaries or Affiliates; (c) being found unsuitable for, or having been denied, a gaming license, or having such license revoked by a gaming regulatory authority in any jurisdiction in which the Company or any of its subsidiaries or affiliates conducts operations; and (d) willful or material

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

misrepresentation to the Company or to the Board relating to the business, assets or operations of the Company.

125. GAN's false statements tortiously interfered with a second prospective job that Arouh would have obtained because he was the only then-active candidate. In 2022, Arouh interviewed to get a new job as the Chief Legal Officer of a $500 million company where a Key Employee License would be required. Arouh interviewed with the entire executive leadership team, including the founders, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, and the Head of Government Affairs, as well as numerous other executives. The Chief Executive Officer ultimately positively reported to Arouh that "everyone liked you," asked Arouh "do you want the job," and stated "we'll make some calls regarding your prior employment at GAN." A GAN executive was contacted and, on information and belief, such executive made disclosures regarding the basis for GAN's termination of Arouh. Such GAN disclosures constituted tortious interference and wrongful disclosure of confidential information in violation of the Employment Agreement, as well as disparagement, defamation, libel and slander of Arouh. GAN's disclosures to the prospective employer effectively killed Arouh's candidacy. Within hours of the GAN executive's conversation with the $500 million prospective employer of Arouh where he was the sole candidate, the prospective employer advised Arouh that the prospective employer was going to consider other candidates and, from that moment on, no one from the prospective employer spoke with Arouh.

126. GAN further breached the Employment Agreement by allowing its executives to disparage, defame, libel and slander Arouh. On information and belief, Smurfit, McGill, and the other Defendants failed to instruct GAN executives not to disparage, defame, libel or slander Arouh.

127. On a third occasion GAN again tortiously interfered with Arouh's prospective economic advantage. In 2022, an executive who had been the Chief Operating Officer of a multi-billion dollar company, met with Arouh to discuss Arouh

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

joining his firm as a partner. During that multi-hour meeting, the prospective partner stated that he would like Arouh to meet with the two other partners, and the executive began arranging such meetings. On information and belief, GAN wrongfully disclosed confidential information regarding the circumstances of Arouh's termination and otherwise disparaged Arouh, and such disclosures again effectively killed Arouh's partnership opportunity.

128.   In a fourth instance, in 2023 Arouh was interviewing to get a new job to spearhead the mergers, acquisitions, and investments aspects of a gaming enterprise that was also a GAN client, where Arouh was the only candidate put forth by the recruiting firm conducting the search. The gaming enterprise's head of HR revealed that at that time Arouh was the only candidate they were considering and that Arouh's credentials were "extraordinary" and a "perfect match for what they were looking for." During Arouh's interview with the lawyer in charge, Arouh was asked if he could extend the 30-minute interview, which then continued for close to two hours; at the end of which the lawyer said he'd have additional meetings set up with 2 other executives. However, following that call, everything stopped: neither the gaming enterprise's lawyer, nor its HR department, nor the recruiting firm contacted Arouh, even though in the prior weeks the gaming enterprise and the recruiting firm were "over the top" in terms of their communication with Arouh, following-up regarding every aspect of the process, with more than 70 such contacts. When Arouh inquired sometime later, the recruiting firm "apologized" to Arouh "for not calling you back," claiming the enterprise "decided not to hire for that role" – even though the job announcement had just been reposted! When reached on his cell phone, the gaming enterprise's lawyer told Arouh "I'm sorry, I don't remember you," and hung up without saying goodbye. Since the two of them had spoken for almost two hours and the lawyer knew Arouh was a key service provider's prior CLO, there was no chance the lawyer "forgot" who Arouh was. It was obvious the lawyer and the gaming enterprise had been tainted by Defendant's false and misleading statements. In short,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1    GAN had caused Arouh to be blackballed from the gaming industry.

2        129. Defendants' bad faith in disparaging, defaming, libeling and/or

3    slandering Arouh is exemplified by the timing of GAN's interference – not only did

4    GAN interfere with at least four of Arouh's prospective economic relationships, but

5    GAN interfered by making false statements regarding Arouh's termination even *after*

6    Smurfit, McGill and the rest of the Defendants petitioned the Pennsylvania Gaming

7    Control Board to withdraw Arouh's license application and expressly stated that the

8    withdrawal was "not due to any activity that would disqualify Mr. Arouh under 58

9    Pa. Code § 421a.2." In essence, by petitioning to withdraw Arouh's license

10   application, GAN was expressly conceding that the license application was still

11   pending and the Gaming Control Board never denied such application. GAN's

12   petition to withdraw Arouh's license application, including its statement that the

13   withdrawal was not due to any disqualifying action by Arouh, is tantamount to an

14   admission that GAN's purported for-cause termination was false.

15       130. Defendants' bad faith in disparaging, defaming, libeling and/or

16   slandering Arouh is also exemplified by the timing of GAN's interference – not only

17   did GAN interfere with at least four of Arouh's prospective economic relationships,

18   but GAN interfered by making false statements regarding Arouh's termination even

19   *after* Defendants were alerted by Arouh, by and through his counsel, on February 2,

20   2022, that GAN's "purported for-cause termination was pretextual, retaliatory, and

21   wrongful in violation of law and public policy" while GAN acknowledged the

22   seriousness of Arouh's position and said they would conduct an investigation, at no

23   time did GAN dispute Arouh's position and the absence of cause to terminate.

24       131. Not only did Defendants fail to object to Arouh's identification that

25   Defendants fired him without cause, for pretextual reasons, but Defendants similarly

26   failed to correct their misconduct. Defendants never notified any regulator, not even

27   the Pennsylvania Gaming Commission, of their false "for cause" grounds in the

28   Termination Letter.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

## M. DEFENDANTS TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE -- DEFENDANTS' BREACHED EMPLOYMENT AGREEMENT IN BAD FAITH AND ON FALSE AND FRAUDULENT GROUNDS DEFAMED AROUH

132. Defendants defamed Arouh on April 29, 2022, when Defendants knowingly circulated publicly the false and misleading written statements that Arouh was a "Delinquent Section 16(a) Reporter" having "violated Section 16(a) of the Securities Exchange Act of 1934" because Arouh "filed a late Form 4 to report two grants of restricted stock units" (the "Defendants' Defamatory Reporting Statements").

133. In making Defendants' Defamatory Reporting Statements, Defendants also violated the express terms of Arouh's Employment Agreement which provided that Defendants "shall refrain from any disparagement, defamation, libel, or slander of any of Executive."

134. The Employment Agreement provides that "[b]oth during and after Executive's employment with the Company, Executive shall refrain from any disparagement, defamation, libel, or slander of any of the Company and Affiliates. Executive further agrees to refrain from any tortious interference with the contracts and relationships of any of Company and Affiliates. This Section 14(a) does not prohibit Executive from disclosing illegal acts that occurred at, or is related to, the Company's workplace."

135. The Employment Agreement provides that "[b]oth during and after Executive's employment with the Company, the Board, President and Executive Vice Presidents (collectively, the "Company Representatives") shall refrain from any disparagement, defamation, libel, or slander of any of Executive. Nothing in this Section 14(b) shall prohibit the Company Representatives from discussing with third parties, including, but not limited to, reference requests from Executive's future employers, regarding: (i) Executive's date of employment; (ii) the status of

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Executive's employment with the Company, if any at the time. Furthermore, nothing in this Section 14(b) shall prohibit the Company Representatives from engaging in internal discussions within the Company regarding Executive's performance or the satisfaction or execution of Executive's duties, responsibility, obligations, or authority.

136. Defendants, directly or by and through other Defendants, widely dispersed Defendants' Defamatory Reporting Statements to the public in writing, including by (1) mailing the proxy to GAN shareholders, as stated in GAN's filing under the Securities Exchange Act of 1934, as amended (the "Exchange Act")[1], (2) filing the proxy with the Securities Exchange Commission, where it was available publicly over the internet on the SEC's EDGAR database; and (3) posting the proxy statement on GAN's public-facing website.

137. Section 16 filing requirements did not apply to Arouh until, at the earliest, November 21, 2021, if they applied at all.

138. Arouh's Form 4 for the two grants of restricted stock units was timely filed on November 22, 2021, within a day that the earliest Section 16 filing requirements could have become applicable to him, if they applied at all.

139. Accordingly, in truth and in fact, Defendants' Defamatory Reporting Statements were false and misleading because: (A) Arouh was not a "Delinquent Section 16(a) Reporter," (B) Arouh had not "violated Section 16(a) of the Securities Exchange Act of 1934," and (C) Arouh had not "filed a late Form 4 to report two grants of restricted stock units."

140. Form 4 reporting requirements apply only to certain officers of a company as defined under Section 16 of the Exchange Act,[2] defined by § 240.16a-(f)

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

---

[1] https://www.sec.gov/Archives/edgar/data/1799332/000114036122016784/edge20003492x1_def14a.htm

[2] Section 16 of the Exchange Act https://www.govinfo.gov/content/pkg/COMPS-1885/pdf/COMPS-1885.pdf

in relevant part to mean "an issuer's president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer."

141.    The title Chief Legal Officer -- Arouh's title at the time of the two grants of restricted stock on November 12, 2021 -- was not listed in Section 16 of the Exchange Act, defined by § 240.16a-(f), as a named executive officer that must file a Form 4.

142.    Similarly, at the time of the two grants of restricted stock, Arouh did not have a covered policy-making function at GAN and thus he was not subject to Section 16 of the Exchange Act, defined by § 240.16a-(f).

143.    GAN advised Arouh for the first time on or about November 21, 2021, that he was probably an executive officer for purposes of Section 16, § 240.16a-(f).

144.    Again, within approximately 24 hours of being so notified by GAN, Arouh timely voluntarily filed the Form 4 on November 22, 2021.

145.    Arouh knew upon learning of Defendants' Defamatory Reporting Statements that they were false. Arouh confirmed the falsity of Defendants' Defamatory Reporting Statements by conferring with the U.S. Securities Exchange Commission.

146.    The U.S. Securities Exchange Commission advised that "it would not stand in the way of such a determination" that the subject [Arouh] of Defendants' Defamatory Reporting Statements was not covered by Section 16, as defined by § 240.16a-(f), and the subject was not required to file a Form 4 based upon: (a) the subject's title at the time of the two restricted stock grants; and (b) the subject's job functionality at the time of the two restricted stock grants.

147.    As further evidence of the timeliness of Arouh's Form 4 filing, and the

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

falsity of Defendants' Defamatory Statements, is that GAN correctly omitted Arouh as a delinquent Form 3 filer in its Proxy Statement filed with the U.S. Securities Exchange Commission on April 29, 2022.

148.   Defendants, including GAN's Chief Legal Officer Sylvia Tiscareño who signed the Proxy Statement, knew, based on the content of the Proxy Statement itself, that Defendants' Defamatory Statements about Arouh being a delinquent filer were false and misleading. A Form 3 is filed under Section 16 of the Exchange Act to reflect an executive's designation as an "officer."[3] The Proxy Statement must list "Delinquent Section 16(a) Reports," which include delinquent Form 3 filings. Tellingly, the Proxy Statement correctly does not list any delinquent Form 3 filings. Here, the Form 3 states in box 2 "Date of Event Requiring Statement (Month/Day/Year) 09/01/2021, and was signed by Karen Flores, Attorney in Fact for Arouh. Then, by Order of Defendants' Board of Directors, on behalf of GAN in the Proxy Statement, the Board of Directors do not state that any Form 3's were untimely filed. The Chief Legal Officer and Corporate Secretary of GAN also signed the Proxy Statement confirming GAN's Board of Directors' statement. In so doing, Defendants admit that the mere fact of Arouh being named Chief Legal Officer on September 1, 2021, in and of itself did not trigger a reporting obligation under Section 16 on that date.

149.   Where, as here, the Form 3 filed by Arouh and signed by a member of GAN's board of directors as attorney-in-fact, was timely filed on November 22, 2021, it is impossible for the Form 4 (which is triggered by the same Section 16) to be deemed late when it was filed the same day.

150.   If Defendants, including GAN, argues to the contrary, then GAN would be admitting that its own Proxy Statement filed with the U.S. Securities Exchange Commission on April 29, 2022 is false. That is, if Defendants try to defend

---

[3] https://www.sec.gov/files/forms-3-4-5.pdf

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Defendants' Defamatory Statements and maintain that Arouh had a Form 4 filing obligation earlier than November 22, 2021, then GAN would be admitting it was required to disclose a delinquent Form 3 filing in its Proxy Statement, as well. GAN, however, correctly admitted that Arouh's Form 3 was timely. GAN cannot have it both ways. GAN cannot say it correctly reported in its Proxy Statement that all Form 3's were timely, including Arouh's November 22, 2021 Form 3, but simultaneously characterize Arouh as an untimely Form 4 filer based on a deadline that predates the Form 3 filing.

151. But were Defendants, including GAN, to defend Defendants' Defamatory Statements in such a way, it would be in further violation of Federal Regulation § 240.14a-9, False or Misleading Statements, which states "(a) no solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact . . .."

**N. Wrongful Termination In Violation of Public Policy – Defendants Terminated Plaintiff For Following The Law and Insisting GAN Follow the Law; Insider Smurfit Allowed to Trade on Material Non-Public Information When New Chief Legal Officer at Helm**

152. Plaintiff is informed and believes, and thereon alleges, that Plaintiff was wrongfully terminated in violation of public policy for following the law. Defendants were motivated to terminate Arouh because he insisted on following the law and requiring GAN and the other Defendants to follow the law that inherently constrained GAN.

153. Plaintiff is informed and believes, and thereon alleges, that Defendants wanted a complicit Chief legal Officer who would allow violations of the law, whether because such new CLO was ignorant of the facts and/or the law or knowingly complicit. Defendants ultimately hired Sylvia Tiscareño, Esq. to replace Arouh as Chief Legal Officer.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

154.   On information and belief, it is alleged that after GAN terminated Arouh, that Arouh's former boss Smurfit sold GAN stock and avoided $104,705 in losses, even though he was in possession of material, non-public information. On information and belief, Smurfit's post-December 2021 sale constituted insider trading in violation of the Federal Securities Laws. On information and belief, Smurfit's post-December 2021 dumping of stock in his own company in anticipation of a significant decline in the market price of that stock was a violation of the Federal Securities Laws. Under the law, information is "material" if a reasonable investor would consider such information important in deciding whether to buy, hold or sell securities. Major changes in management are material information. In fact, GAN's Policy On Insider Trading And Communications With The Public, which policy is distributed to all GAN employees and is not marked as confidential, specifically lists under the heading "Examples of Material Information," in relevant part, that "information concerning the following subjects is often found to be material: * * * (vii) major changes in management or the board of directors."

155.   Anders Karlsen, who was the President of more than half of GAN's business – its business-to-consumer sports betting business – resigned effective August 26, 2022. Karlsen's resignation was "material" for purposes of insider trading.

156.   On information and belief, it is alleged that Sylvia Tiscareño, Esq. permitted insider Smurfit to sell GAN stock on August 29, 2022, at a time that was approximately 7 hours prior to GAN releasing the information in a manner that was designed to achieve broad public dissemination of the information immediately upon its release. Smurfit was able to dump his GAN stock 7 hours before the resignation information was broadly disseminated to the market at prices ranging from $2.84 to $3.03. The stock price was substantially lower 7 hours after President Karlsen's resignation was broadly disseminated to the market.

157.   On information and belief, it is alleged that the first listing in the news that President Karlsen had resigned was on August 29, 2022, at 3:23 p.m. Eastern

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    Time on an obscure website.[4]

2        158.    Tellingly, GAN did not post the Karlsen resignation information on the

3    business wire services as GAN customarily does with material information, nor did

4    GAN post the information on its Investor Website on August 29, 2022, even though

5    GAN has three places it could have so posted: (a) "Press Releases," (b) "Events and

6    Presentations," and (c) "Reports."

7        159.    At some point, GAN eventually posted under the "Featured Story"

8    category on its web site titled "GAN Appoints Endre Nesset as President of B2C,"

9    which Featured Story category is an area of GAN's web site not highlighted for

10    investors.

11        160.    Rather than either prohibit Smurfit's insider trading or properly disclose

12    the material information of an executive resignation on the wire services and on its

13    Investor Website, it appears the Chief Legal Officer who replaced Arouh allowed

14    Smurfit to trade GAN stock and buried the material information of President

15    Karlsen's resignation in an obscure and inappropriate area of the GAN website in

16    violation of the well-known Securities and Exchange Commission (SEC) Regulation

17    FD. Actually, Sylvia Tiscareño, Esq. was well aware of Regulation FD because she

18    and Arouh had previously discussed an article Arouh had written explaining

19    Regulation FD.

20        161.    The SEC stated in the Adopting Release for Regulation FD that "an

21    issuer's posting of new information on its own website would not by itself be

22    considered a sufficient method of public disclosure."[5]

23        162.    Significantly, the replacement Chief Legal Officer failed to disclose

24    timely the resignation information (1) in a GAN Form 8-K or other documents filed

25

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

---

26    [4]   https://www.marketscreener.com/quote/stock/GAN-LIMITED-38509005/news/GAN-Appoints-Endre-Nesset-as-President-of-B2C-41643279/?utm_medium=RSS&utm_content=20220829

27    [5] https://www.sec.gov/rules/final/33-7881.htm

28

1   with the SEC; (ii) in a press release; (iii) in an investor relations disclosure on the
2   Company's website; or (iv) a conference call or webcast.

3       163.   According to the Form 4 Smurfit filed with the Securities Exchange
4   Commission, Smurfit sold shares on August 29, 2022, "at prices ranging from $2.84
5   to $3.03,"[6] meaning Smurfit sold GAN stock *before* the material non-public
6   information was announced as required by the SEC's Regulation FD and as required
7   by Federal Securities Laws.

8       164.   Smurfit's August 29, 2022 trades were before the information was
9   widely dispersed in the market, since the trades must have been in the early morning
10  of August 29, 2022, the only time the stock traded as high as Smurfit's selling prices.
11  In so doing, Smurfit was trading on insider information, in violation of the Federal
12  Securities Laws and the Securities and Exchange Commission's Regulation FD.

13      165.   The following chart showing trading prices of GAN stock on August 29,
14  2022, the only time that GAN stock was traded above $3 a share, and about 7 hours
15  before GAN disclosed the material information that President Karlsen had resigned
16  according to the first published report of that information in a news article, and at least
17  2 full trading days before Smurfit should have been allowed to trade in accordance
18  with GAN's written Insider Trading Policy.

19      166.   GAN's Insider Trading Policy states in relevant part as follows
20  (emphasis added):

21
22      Mr. Dermot possessing material non-public information must not
        engage in any transactions in GAN securities until such information has
23      been known publicly for at least two full trading days.

24
25      167.   Sylvia Tiscareño, Esq. was appointed by GAN, in her capacity as Chief
26  Legal Officer, to enforce and implement GAN's Insider Trading Policy. The Policy

27  _____
    [6]https://www.sec.gov/Archives/edgar/data/1799332/000149315222024495/xslF345X03/ownership.xml
28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  stated Smurfit "must receive pre-clearance (from Sylvia Tiscareño, Esq.) prior to
2  trading (i.e.: selling) in GAN securities." Smurfit was required under the Insider
3  Trading Policy to ". . . request pre-clearance using the "Designated Insider Pre-
4  Clearance Request Form," which form required Sylvia Tiscareño, Esq.'s signature to
5  authorize Smurfit to trade; so, by Sylvia Tiscareño, Esq. signing Smurfit's Pre-
6  Clearance Request Form while knowing that the material information had not been
7  properly disclosed, Sylvia Tiscareño, Esq. permitted and facilitated Dermot Smurfit
8  dumping his personal stock based on material non-public information, in violation of
9  the Federal Securities Laws and GAN's Insider Trading Policy.

10     168.  On information and belief, it is alleged that Smurfit avoided about
11  $104,705 in losses as a result of the complicit new CLO Sylvia Tiscareño's and
12  Smurfit's violation of the Federal Securities Laws, the SEC's Regulation FD, and
13  violation of GAN's Insider Trading Policy, as shown in this chart.



18     169.  Another example of insider trading that, on information and belief, was
27  permitted by GAN and CLO Sylvia Tiscareño, Esq. is when, on information and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

belief, Smurfit disposed of tens of thousands of shares of the Company's stock at a time when Smurfit knew the price was inflated with his materially false and misleading statements regarding GAN's business practices and its contracts with content providers, notwithstanding the fact that Smurfit and GAN knew that the contracts made no economic sense. Smurfit failed to file his Form 4 with the United States Securities and Exchange Commission within two business days following the transaction date.  Smurfit did not file his Form 4 until April 10, 2023, 28 days after Smurfit was required to do so. The next section discusses the substance of the material non-public information that GAN failed to disclose.

**O.  Wrongful Termination In Violation of Public Policy – Defendants Terminated Plaintiff For Following The Law and Insisting GAN Follow the Law; Post- Arouh Termination GAN Issues Grants to Insiders Despite Material Non-Public Information**

170.   Defendants terminated Arouh because he followed the law and insisted GAN follow the law. Two post-termination events show the new CLO did not require GAN to follow the law. Specifically:

   a.   GAN *waited* until April 25, 2023, *to publicly disclose* the material fact to the market that there was no exclusive agreement with Incredible Technologies, when GAN knew *eight months* earlier that its public statements to the market about the existence of such key agreement was false.

   b.   GAN *waited* until March 20, 2023, *to publicly disclose* the material fact to the market that The Ainsworth Game Technology Agreement needed to be amended as it made no economic sense, when GAN knew at least *three months* earlier that the agreement made no economic sense.

171.   GAN benefitted by failing to timely and fully disclose the truth, as required by law.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

172.   The Incredible Technologies Agreement was first publicly announced by GAN on or about June 17, 2021.

173.   The Ainsworth Game Technology Agreement was first publicly announced by GAN on or about May 17, 2021.

174.   GAN made positive statements to the market about The Incredible Technologies Agreement and the Ainsworth Game Technology Agreement. For example, in addition to disclosing the two key contracts themselves, GAN later informed the market about the exclusive Ainsworth gaming content vis Super RGS, and informed the market of the strategic importance of the Super RGS product. See, e.g. December 1, 2021 public statements.

175.   These statements about the two key contracts were false.

176.   In fact, after Defendants terminated Arouh in December 2021, a GAN executive stated in January 2022 that "the Ainsworth and Inc. Tech. content distribution agreements make no fu*king economic sense and must be renegotiated; it's going to be a fu*king nightmare."

177.   This December 2021 GAN admission evidences that Smurfit (on behalf of himself and on behalf of the Defendants) issued materially false and misleading statements regarding GAN's business practices and its contracts with content providers in violation of the Securities Exchange Act of 1934.

178.   Specifically, on information and belief, Plaintiff thereon alleges that Smurfit misleadingly concealed the truth from the public, and otherwise selectively disclosed information to the public, when Smurfit knew, in fact, that The Incredible Technologies Agreement and the Ainsworth Game Technology Agreement made no economic sense. See Federal Securities Law and SEC Regulation FD, which would have required disclosure that the agreements made no economic sense within 24 hours.

179.   GAN cannot claim ignorance of the falsity of its public statements as its basis for waiting well over a year to cure its false statements, as required by law.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  Indeed, GAN was reminded by a third party in March 2022 that internal GAN

2  executives concluded that the two agreements made no economic sense.

3      180.  Despite knowledge of the falsity of their public statements, GAN did not

4  timely issue corrective disclosures in early March 2022.

5      181.  Thereafter, on information and belief, in March 2022, Incredible

6  Technologies served GAN with a notice that GAN was in default of their agreement,

7  and later in April 2022, Incredible Technologies terminated its agreement with GAN.

8      182.  GAN still failed to disclose the truth to the market.

9      183.  In fact, it was not until March 20, 2023, three months after GAN was

10  told that the Incredible Technologies and the Ainsworth distribution agreements

11  "made no economic sense," and 16 days after Smurfit was alerted that GAN's public

12  disclosures were false and selective because the two agreements "made no economic

13  sense," that Smurfit finally revealed in a conference call that GAN then had a ". . . a

14  plan to shutter the Super RGS business line," disingenuously claiming that such plan

15  was "new." Tellingly, Smurfit didn't volunteer that information to the market; instead,

16  Smurfit's disclosure was forced by an analyst's question specifically asking about the

17  Super RGS business.

18      184.  On March 30, 2023, three months after a GAN executive confirmed that

19  the two distribution agreements made no sense, after knowing that the Incredible

20  Technologies agreement had been terminated, and 26 days after Arouh alerted Smurfit

21  of the illegal disclosures that the distribution agreements "made no economic sense,"

22  Smurfit revealed: ". . . it has become apparent to us that the capital requirements to

23  gain market share for initiatives such as Super RGS [(which is the product based in

24  large part on the Ainsworth and Incredible Technology content distribution

25  agreements)] . . . *do not provide a path toward achieving an acceptable ROI* in a

26  reasonable period of time. As such, we have elected to allocate capital away from

27  these endeavors . . ." (emphasis added).

28      185.  On or about May 10, 2023, Smurfit revealed further information that, on

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

48

information and belief, had been known by Smurfit on March 30, 2023, but concealed from the investing public. On May 10, 2023, Smurfit revealed the truth regarding the Ainsworth Agreement and its negative impact on GAN. GAN disclosed that *amending* the existing Ainsworth Agreement was "immensely positive," as it accounted for a "reduction of future cash commitments by $15 million or $5 million on an annual basis." Smurfit also revealed that to fix its error in entering into the agreement in the first instance, the Company had to issue to Ainsworth an "equity stake in our company," which turned out to be more than a million shares of GAN stock, which further diluted shareholders. Smurfit remained silent regarding the Incredible Technologies termination notice.

186.   The extent to which Smurfit knew the extent of his false and misleading statements was further revealed on or about May 8, 2023, when it was revealed that Smurfit had entered into the Ainsworth Amendment on *March 29, 2023*– some 41 days after he misleadingly had alluded to the issue on March 30, 2023. Specifically, Smurfit stated on March 30, 2023 that "we have elected to allocate capital away from these endeavors," but at that time Smurfit *knew – from just having signed the Ainsworth amendment the day before* – and failed to disclose the true reality of what was contained in the Ainsworth amendment and what that meant for GAN's further business prospects. That nail in the coffin for GAN's prospects as it related to GAN's super RGS line of business was that the Incredible Technologies agreement was terminated, which Smurfit also did not reveal.

187.   The materiality of GAN's selective and false disclosures is significant. As Smurfit knew at that time, GAN's then most recently announced net income (loss) was $1.5 million for the quarter and, on information and belief, Smurfit would have understood that a $5 million loss a year due to Ainsworth for the next 3 years would have devastating and adverse consequences.

188.   Regarding the Incredible Technologies exclusive distribution agreement, GAN reported that the agreement was significant (e.g. a second pillar of GAN's Super

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

RGS strategy), but later revealed the truth that the agreement was in fact not terminated, but rather, it didn't even exist!

189.  On August 16, 2021, Defendants gave a public presentation indicating that "Super RGS [is] POISED FOR LAUNCH (emphasis is Smurfit's)." Defendants specifically stated under the heading "*SECURED* PROVEN GAMES" that "*[e]xclusive* multi-year distribution deals with Ainsworth and Incredible Technologies provides library of proven retail content."

190.  On August 16, 2021, Defendants also issued a press release stating "Signed *Exclusive* Deals with Ainsworth and Incredible Technologies Further Augmenting Content Portfolio."

191.  "Smurfit, CEO of GAN stated: "Most importantly, we made great progress in executing our long-term growth strategy during the first half of the year. * * * It also was highlighted by two exciting, *exclusive* content deals with Ainsworth and Incredible Technologies. We continue to emphasize the importance of possessing exclusive content and an industry-leading library of the most recognizable and popular retail games. These efforts and agreements will allow us to grow our take rate from U.S. iGaming revenue and position GAN as a content supplier of choice for large operators with diverse content line-ups."

192.  The presentation also stated under the heading "Performance and Operational Highlights" in a separate bullet: Incredible Technologies, Inc online slot portfolio. Obtained *exclusive* online rights to all current and future Incredible Technologies' online games, which will grow to over 110 games during the term of the *contract* (emphasis added). Clients of GAN for both RMiG and SIM have access to nearly 1,200 games which now includes proven, exclusive land-based content from two leading gaming suppliers."

193.  On October 15, 2021, at the GAN Investor Event, Smurfit provided a slide giving an OVERVIEW OF GAN'S B2B OFFERING that stated over and over that GAN had an *exclusive* agreement with Incredible Technologies and using

50

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Incredible Technologies' logo. Smurfit presented: "Exclusive games: Ainsworth & Incredible Technologies," "*Exclusive* games from Ainsworth, Incredible Technology and GAN."

194.   Defendants listed "GROWTH OPPORTUNITIES: SUPER RGS that Defendants *SECURED* PROVEN GAMES" with "*[e]xclusive* multi-year distribution deals with Ainsworth and Incredible Technologies provides library of proven retail content. This enables an increase in GAN's take rate from U.S. iGaming revenue (emphasis added)."

195.   On August 15, 2022, Smurfit stated to the public "[o]perationally, we continue to enhance and expand our product offerings. I'm delighted to announce today that Caesars Entertainment has been secured as a client of our iGaming Super RGS, which now lifts our content distribution network reach to approximately 50% of the overall U.S. iGaming market, up from 20% at the beginning of this year with a target to reach 80% in 2023.

196.   Notwithstanding that Defendants had on at least 10 occasions specifically stated that Defendants had an "exclusive" agreement and "secured" a contract with Incredible Technologies, during a call with investors on April 5, 2023, in a stunning admission Defendants revealed that, in truth and in fact, the exact opposite was the case: there was *no* exclusive agreement with Incredible Technologies! Smurfit made that admission in response to a question from an analyst: "Incredible Technologies, I think you had an exclusive with them as well. Any change to that agreement?"  Smurfit responded: "No, no.  There was no exclusive agreement with Incredible Technologies ultimately consummated . . ."

197.   Here's a screen-shot of the relevant portion of the transcript showing that Smurfit admission:

GARCIA & ARTIGLIERE

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

**Ryan Sigdahl:** Hey. Good afternoon, Dermot. Curious, Super RGS, it's been a focus area, you're pulling capital or resources away from it. I guess the plan to continue to support existing relationships and kind of work as is, but just push resources away? Or is it planning to kind of shutter that business line?

**Dermot Smurfit:** Thanks, Ryan. There's a new plan to shutter that business line. In fact, the only area which we're reallocating resources is in relation to the exclusive content distribution deal that leads into its Ainsworth, which has been amended to save our company $15 million in cash.

**Ryan Sigdahl:** Helpful. Incredible Technologies, I think you had an exclusive with them as well. Any change to that agreement?

**Dermot Smurfit:** No, no. There was no exclusive agreement with Incredible Technologies ultimately consummated and we continue to distribute those and many others. In fact, we have 36 individual game contact suppliers integrated into our iGaming aggregation platform, which is one of the largest contact portfolios available anywhere in the U. S.

198.   With that Smurfit admission it became even clearer that what Smurfit, on behalf of Defendants, and the rest of the Defendants publish and say to investors is just like in the movie Wolf of Wall Street, when Mark Hanna (played by Matthew McConaughey) stated during a lunch with Jordan Belfore (played by Leonardo DiCaprio) about the stock market: "It's all a fugayzi, you know what a fugayzi is? * * * It's a "Fugayzi, fugazi. It's a whazy. It's a woozie."

199.   As a result of Smurfit's false statements, GAN's stock traded at inflated levels. However, after the truth was revealed to the market, GAN's shares were hammered by sales, sending the stock down 20% in the four trading days immediately following that conference call on May 16, 2023.

200.   Most significantly, from the time a third party first notified Smurfit/GAN of the selective disclosure issue, Smurfit/GAN waited over a year to fix the issue. Indeed, Smurfit/GAN should have disclosed by March 4, 2022, however they didn't do so until May 16, 2023. A 77% stock drop occurred (from $5.52 on 3/16/22 to $1.26 on 5/16/23).

201.   Between June 17, 2021 -- when Defendants first notified the public that Defendants had an exclusive multi-year distribution agreement with Incredible

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Technologies, and April 5, 2023 – when Defendants notified the public that there was *no* exclusive multi-year distribution agreement with Incredible Technologies, GAN's stock price was decimated, falling from $18.04 to $1.19 a share, for a 93.4% decline in the stock price.

202.   During this same period (6/17/21-4/5/23), on information and belief, Smurfit and the other Defendants personally sold millions of dollars of GAN stock to unwitting investors in GAN stock; in doing so, Smurfit and the other Defendants enriched themselves by millions of dollars and awarded themselves cash and stock bonuses of millions more for a job purportedly "well done."

203.   Defendants, including Smurfit, benefitted by failing to make the requisite public disclosures. Once the truth came out, the value of the shareholders' company declined from about $758 million to $53 million. Defendants managed to lose $705 million in market capitalization of GAN.

204.   Defendants fired Arouh because Arouh was following the law, including Federal Securities Laws, and requiring Defendants to follow the law.

205.   Around the time Arouh was terminated, the 2021 Form 10-K public filing deadline requiring Arouh's approval was approaching and GAN wanted a more conciliatory Chief Legal Officer to approve the public filing, as well as comply – or fail to comply – with the balance of the Exchange Act of 1934 and the rules and regulations promulgated thereunder, as well as the Nasdaq exchange's (where GAN's stock trades) rules and regulations.

206.   And Defendants were further motivated to choose a different Chief Legal Officer that did not have experience doing the job so would be far more compliant to Defendants' chicanery.

207.   The perfect candidate: Sylvia Tiscareño who had no experience with the Exchange Act of 1934, no experience complying with the SEC's reporting obligations and the related disclosure obligations, no experience managing a company traded on Nasdaq and complying with the rules and regulations thereunder, and no experience

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

managing a public company.

208.    Defendants' ability to take advantage of a replacement Chief Legal Officer was enhanced by almost all of the senior-most executive team that ran GAN – other than Smurfit – mysteriously no longer working at GAN. With them went the institutional knowledge about GAN that would help keep the Defendants in check. Specifically, all 23 of these senior executives were out of the proverbial hen house around the time GAN fired Arouh and subsequent thereto: (i) President, Enterprise Solutions; (ii) Chief Financial Officer; (iii) Senior Vice President, Finance; (iv) Chief Information Officer; (v) Chief of Gaming Operations; (vi) Chief Executive Officer (Coolbet); (vii) Chief Commercial Officer; (viii) Senior Vice President, Sales and Sales Operations; (ix) Senior Vice President, Commercial and Partnerships; (x) Managing Director, Mergers and Acquisitions; (xi) Senior Vice President, Gaming Compliance; (xii) Senior Vice President Gaming Operations; (xiii) Senior Manager Financial Planning & Analysis; (xiv) Senior Manager, SEC and Corporate Accounting; (xv) Senior Director Marketing Services & Communications; (xvi) Senior Director, Product Solutions; (xvii) Senior Director, Customer Success; (xviii) Senior Compliance Analyst; (xix) Senior Quality Assurance Engineer; (xx) Senior Global Technical Recruiter; (xxi) Director, Finance; (xxii) Director, QA; and (xxiii) Head of Strategy.

209.    Before Defendants fired Arouh, the prior Chief Legal Officer was also out at GAN.

210.    Perhaps most telling, most of these executives were not replaced and, in some cases, like the critical Chief Financial Officer role, are being filled by a fairly junior "acting" person.

211.    Defendants were financially motivated to terminate Arouh for his insistence on following the law.

212.    After Arouh's termination in December 2021, Defendants (including Smurfit) benefited by: (a) causing GAN to issue more than $2.9 million in

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  performance based compensation of stock units to Smurfit himself (and a couple other
2  executives) on March 11, 2022 – just 10 days before GAN's March 22, 2022
3  disclosure of errors in its accounting and, more importantly, at least 3 months *after*
4  GAN knew of accounting problems with the Ainsworth and Incredible Technologies
5  content distribution agreements; and (b) causing GAN to issue substantial cash
6  bonuses and stock options to other executives and directors on the same basis.

7      213.  On information and belief, after Arouh's termination, GAN was also
8  improperly "front-loading" customer payments that were required to be allocated over
9  the life of the contract and, in so doing, improperly increasing GAN's reported
10  income, which appears to be during times Smurfit and, based on further information
11  and belief, at the same time Smurfit, McGill and their cohorts were awarding
12  themselves cash and stock bonuses and other stock grants and dumping stock on the
13  market. Smurfit's role as president of GAN and a board member, and McGill's role
14  as a board member and Chair of the Compensation Committee in rewarding their own
15  failure to supervise and manage the company and the financial impact of agreements
16  they agreed to, was absolutely and manifestly ridiculous.

17      214.  Subsequent to Arouh's termination, Arouh would subsequently learn
18  that GAN had even more material weaknesses in its financial reporting processes, all
19  of which occurred while Smurfit was president, getting cash and stock grants and
20  dumping his stock in the market for his personal gain.

21      215.  On information and belief, GAN had uncertainty regarding the regulated
22  environment in Chile which accounted for about a third of GAN's revenue,
23  uncertainty on how much of a 19% VAT tax may be owed, and that resolution of the
24  matter may result in "fines, penalties, additional expenses, or require GAN to exit
25  Chile." This risk began in the same month Smurfit terminated Arouh in December
26  2021 and the materiality and granularity of this risk was only recently disclosed. On
27  information and belief, Smurfit didn't want to disclose this material risk to further
28  prop-up GAN's stock price so he and his cohorts could continue to grant themselves

1  stock and bonuses as a reward for purported work and then dump stock on the market

2  at those artificially inflated prices

3      216.   These massive post-Arouh termination grants of GAN stock to Smurfit

4  and other Defendants appear, on information and belief, to be about 5% of the entire

5  then market capitalization of GAN – that is Smurfit and his Defendant co-conspirators

6  took about 5% of GAN for themselves at a time they knew they had a material

7  problem with both content agreements (the Ainsworth agreement and the Incredible

8  Technologies agreement, if it ever existed in the first instance) that Smurfit was not

9  disclosing to the public, and material deficiencies in how and when they were

10  reporting income, as well as all kinds of other accounting deficiencies! On

11  information and belief, Defendants were siphoning out of GAN nearly $10 million in

12  cash and stock grants while in possession of material non-public information of

13  Smurfit's inept management and refusal to disclose the economic impact of the

14  Ainsworth and Incredible Technologies agreements (or by touting the non-existent

15  exclusive Incredible Technologies distribution agreement), and knowing that as board

16  members, Smurfit and McGill rendered improper management and oversight during

17  which numerous, material weaknesses in the company's financial reporting system

18  occurred.

19  **P.   GAN's Bad Faith Refusal To Agree With Plaintiff That Its "For Cause"**

20  **Termination Letter Was Erroneous, Would Require GAN To Inform Its**

21  **Gaming Regulators of False Submissions That Conflict With GAN's "For**

22  **Cause" Termination Letter**

23      217.   As alleged hereinabove, GAN's December 9, 2021 Termination Letter

24  states that Arouh was terminated for cause.

25      218.   Arouh advised GAN in writing on February 2, 2022 that the for-cause

26  termination was false.

27      219.   Notwithstanding Plaintiff advising GAN that its December 9, 2021

28  Termination Letter was false, GAN refused to rescind, correct, modify or otherwise

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

agree with Plaintiff that its for-cause December 9, 2021 Termination Letter was false.

220.   After receipt of Plaintiff's February 2, 2022 letter contesting the veracity of the for-cause basis of the December 9, 2021 Termination Letter, GAN, by words and/or conduct, reaffirmed its position that its former Chief Legal Officer Arouh was terminated for cause.

221.   Plaintiff is informed and believes, and thereon alleges, that GAN has not notified GAN's gaming regulators of the basis of the for-cause December 9, 2021 Termination Letter of GAN's former Chief Legal Officer.

222.   Plaintiff is informed and believes, and thereon alleges, that GAN would have been and remains legally required to promptly notify its gaming regulators if indeed GAN in good faith believed that its for-cause December 9, 2021 Termination Letter of Arouh was true in each of the following instances:

  (a)   If GAN believed Arouh engaged in intentional and willful misconduct that may subject the Company to criminal or civil liability.

  (b)   If GAN believed Arouh failed to cooperate in any investigation by the Company or with any investigation, inquiry, hearings, or similar proceedings by any governmental authority having jurisdiction over the Company or its Subsidiaries or Affiliates.

  (c)   If GAN believed Arouh was found unsuitable for, or having been denied, a gaming license, or having such license revoked by a gaming regulatory authority in any jurisdiction in which the Company or any of its subsidiaries or affiliates conducts operations.

  (d)   If GAN believed Arouh engaged in willful or material misrepresentation to the Company or to the Board relating to the business, assets or operations of the Company.

223.   Plaintiff is informed and believes, and thereon alleges, that GAN failed

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1  to do so and GAN's failure to do so is ongoing.

2  **Q.  GAN's Bad Faith – GAN Either Terminated Arouh Without Good Cause**

3  **or GAN Filed a False Petition with Pennsylvania Gaming Control Board**

4  **Regarding Plaintiff**

5  224.  Plaintiff is informed and believes, and thereon alleges, that if GAN

6  believed it validly terminated Arouh for cause as set forth in the Termination Letter,

7  then GAN filed a false and misleading Petition with the Pennsylvania Gaming Control

8  Board on January 3, 2022.

9  225.  In GAN's January 3, 2022 Petition to the Pennsylvania Gaming Control

10  Board regarding its former Chief Legal Officer Arouh's license application, GAN

11  stated: ". . . the withdrawal of the license application noted in this Petition was not

12  due to any activity that would disqualify Mr. Arouh under 58 Pa. Code § 421a.2."

13  226.  GAN's December 9, 2021 Termination Letter to Arouh, however, stated

14  the opposite when GAN contended, *inter alia*, that Arouh was terminated pursuant to

15  Paragraph 5(b)(vii) of the Employment Agreement because he allegedly engaged in

16  "[i]ntentional and willful misconduct that may subject the Company to criminal or

17  civil liability." Again, Plaintiff denies all such misconduct, and the Company has

18  never identified any such misconduct to Arouh despite written request. Such alleged

19  misconduct, if true, would disqualify Arouh under 58 Pa. Code § 421a.2.

20  227.  GAN's January 3, 2022 Petition to the Gaming Control Board evidences

21  the falsity and lack of good faith in GAN's Termination Letter to Arouh.

22  **R.  GAN's Bad Faith – GAN's Multiple Statements in Direct Conflict with**

23  **Each Other are in Bad Faith and in Violation of State Gaming Law and**

24  **Professional Ethical Standards**

25  228.  If GAN's outside counsel who filed the January 3, 2022 GAN Petition

26  withdrawing Arouh's license application with the Pennsylvania Gaming Control

27  Board, which stated "… the withdrawal of the license application noted in this Petition

28  was not due to any activity that would disqualify Mr. Arouh under 58 Pa. Code §

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

421a.2," also knew of GAN's Termination Letter setting forth for-cause termination grounds, then such outside counsel would be violating Rule 8.3 of the Professional Rules of Conduct by failing to file an honest and accurate report with the Gaming Control Board.

229.  If GAN's outside counsel who filed the January 3, 2022 Petition to the Gaming Control Board stating "… the withdrawal of the license application noted in this Petition was not due to any activity that would disqualify Mr. Arouh under 58 Pa. Code § 421a.2" also knew of Arouh's February 2, 2022 letter to GAN and others contesting the legitimacy of the for cause termination grounds stated in GAN's Termination Letter, and knew of GAN's subsequent insistence that its for-cause Termination Letter was valid, then such GAN outside counsel would also be violating Rule 8.3 of the Professional Rules of Conduct by failing to file an honest and accurate report with the Gaming Control Board.

230.  Plaintiff is informed and believes, and thereon alleges, that Sylvia Tiscareño, Esq., GAN's Chief Legal Officer who replaced Arouh, similarly violated Rule 8.3 of the Professional Rules of Conduct by failing to inform the Pennsylvania Gaming Control Board that the January 3, 2022 Petition filed by GAN's outside counsel was false and misleading to the extent that she had knowledge of GAN's for-cause December 9, 2021 Termination Letter to Arouh that directly contradicted the legitimacy of the Petition to the Pennsylvania Gaming Control Board stating Arouh had engaged in no activity that would disqualify Arouh. Sylvia Tiscareño, Esq. further violated that rule as she was undoubtedly involved in outside counsel's preparation of the Petition and facilitated in outside counsel manufacturing a false and misleading Petition when Sylvia Tiscareño, Esq. failed to provide the Termination Letter to outside counsel, if that was the case. Further, Sylvia Tiscareño, Esq. further violated Rule 8.3 by failing to inform the Pennsylvania Gaming Control Board under her ongoing obligation to do so as part of her gaming licensing requirements when Sylvia Tiscareño, Esq. failed to report to the Pennsylvania Gaming Control Board that Arouh

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  provided to her the February 2, 2022 letter to GAN and others specifically contesting

2  the legitimacy of the for cause termination grounds stated in GAN's Termination

3  Letter.

4      231.  Plaintiff is informed and believes, and thereon alleges, that Sylvia

5  Tiscareño, Esq., similarly failed to notify the Pennsylvania Gaming Board that

6  Smurfit and McGill violated Gaming Regulations by violating their respective

7  Principal Gaming Licenses.

8  **S.  GAN's Bad Faith –GAN Concealed Its Petition From Arouh So He Couldn't**

9  **Sound The Alarm**

10      232.  Tellingly, GAN violated the law to conceal from Arouh its January 3,

11  2022 petition filed with the Pennsylvania Gaming Commission Board and to cover-

12  up its wrongdoing, when Smurfit, GAN's CEO, and GAN's Chief Legal Officer,

13  Sylvia Tiscareño, Esq. (both of whom were acting on behalf of GAN in causing GAN

14  to file the petition and were licensed by the Pennsylvania Gaming Control Board), as

15  well as Stephen D. Schrier, Esq. (who signed the Petition on behalf of GAN), failed

16  to serve GAN's Petition on Arouh, as specifically required by Pa. § 493a.4 (c)

17  ("Petitions must . . . be served on all persons directly affected."). That Petition

18  contained this critical GAN admission: ". . . the withdrawal of the license application

19  [(of Arouh)] was not due to any activity that would disqualify Arouh under 58 Pa.

20  Code Section 421a.2." That GAN sworn statement shows Smurfit's December 9,

21  2021 Termination Letter to Arouh alleging Arouh had engaged in conduct

22  constituting "cause" as a basis of termination was false and misleading, because if it

23  were true (which it was not) it would constitute activity that would disqualify Arouh

24  under 58 Pa. Code Section 421a.2. By failing to serve Arouh with the Petition, GAN

25  actively interfered with and prevented Arouh from sounding the alarm that GAN had

26  knowingly and willingly made numerous false statements, created false business

27  records, and raising concerns necessitated by this complaint with the Pennsylvania

28  Gaming Control Board.

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

60

233.   By submitting a false and misleading Petition, failing to serve it on Arouh, and by sending Arouh the false and misleading December 9, 2021 Termination Letter alleging he was terminated for cause – when he certainly was not, Smurfit, McGill and CLO Tiscareño each further violated the Pennsylvania Gaming Control Board Statement of Conditions applicable to them as a licensee, because each of them personally breached their respective agreement to "maintain the suitability requirements of the Act, including but not limited to those relating to . . . honesty . . ." and "inform the Board of any actions which I know or suspect constitute a violation of the Act . . ." On information and belief, at no time has Smurfit, McGill and CLO Tiscareño apprised the Pennsylvania Gaming Control Board, nor any other regulator, of their scheme.

234.   Smurfit, McGill and CLO Tiscareño obviously pressured Michael P. Trainor, Esq. – or kept it secret from him, to violate the law by not serving Arouh, since Michael P. Trainor, Esq. signed the Certificate of Service that the Petition was served on only 3 people (all of them at the Pennsylvania Gaming Control Board), but not Arouh as required by law.

235.   Smurfit, McGill and CLO Tiscareño each individually and as part of a scheme did further engage in a violation of the law to ensure Arouh's claims -- and thus the wrongdoing of Smurfit, McGill and CLO Tiscareño, the rest of the Defendants, and each of them, on information and belief, were concealed and covered-up, by withholding and not truthfully informing GAN's auditors, Grant Thornton LLP, of Arouh's asserted and unasserted claims.

236.   The rule for accounting for contingencies under U.S. Accounting Standards, Codification Topic ASC 450: Accrue a liability when loss is probable (which is defined as "likely" under U.S. GAAP) and reasonably estimatable. Based on the manifestly inapposite claims Smurfit, McGill and CLO Tiscareño knew Defendants made regarding the basis of Arouh's termination (i.e.: (A) GAN's December 9, 2021 statements that Arouh was terminated for two reasons: (i) failing

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

to pay the taxes, and (ii) failing to gain approval for the Pennsylvania gaming license), (B) GAN's December 9, 2021 Termination Letter in which Defendants purported to base the termination on entirely different, fabricated grounds, and (C) GAN's January 3, 2022 Petition to the Pennsylvania Gaming Control Board in which Defendants effectively admit their December 9, 2021 Termination Letter was false and misleading. Smurfit, McGill and CLO Tiscareño knew Arouh's claims were probable and, on the face of their unreconcilable statements, there was high likelihood of an unfavorable outcome for them regarding Arouh's contract claims.

237. Moreover, Arouh had already raised his claims in February 2022. Specifically, (A) Arouh's February 2, 2022 attorney letter to Defendants ("Arouh's Attorney's Notice Letter") and (B) a February 2022 Complaint of Employment Discrimination Before The State of California, Department of Fair Employment and Housing, Under the California Fair Employment and Housing Act), Gov. Code, Section 12900 et. seq. of Arouh's report that GAN's purported for-cause termination was a pretextual, retaliatory, and wrongful termination in violation of law and public policy that Arouh was demanding payment under his Employment Agreement as having been terminated without cause to avoid, as stated in Arouh's Attorney's Notice Letter "litigation." Such damages were not only reasonably estimable, the damages are specifically calculable under the terms of the Employment Agreement. As such, Smurfit, McGill and CLO Tiscareño were obligated to inform GAN's auditors, Grant Thornton LLP, of Arouh's claims.

238. Regardless, unasserted claims must also be disclosed to the auditors, even when the injured party has not yet notified the company. Defendants had an independent duty to disclose Arouh's claims to its auditor.

239. With respect to disclosures, ASC 450 requires the entity to disclose the nature of the unasserted claim or loss contingency, and either an estimate of the possible loss, a range of the possible loss, or a statement that such an estimate cannot be made, be disclosed. On information and belief, GAN's auditors never accrued or

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1 disclosed anything regarding Arouh's claims and Smurfit, McGill and CLO Tiscareño

2 knew that for financial reporting purposes Arouh's claims were ignored by GAN's

3 auditors in violation of U.S. GAAP.239. In so doing, each of them mislead GAN's

4 auditors into improperly preparing GAN's financial statements in accordance with

5 U.S. GAP, and each of them then violated the Exchange Act of 1934 by signing any

6 financial reporting statements, including registration statements, which on

7 information and belief, made no such reserve regarding Arouh's claims.

8 **T.** **Defendants' Bad Faith And Breach of Contract –Defendants Subterfuge**

9 **Attempting to Deny Arouh Existing Contractual Rights Pursuant to His**

10 **Indemnification Agreement and Defendants' Breach of Contract For Refusing**

11 **To Honor its Indemnification Agreement With Arouh.**

12 240.  GAN Nevada, Inc., pursuant to its bylaws, Article 7.1, is obligated to

13 indemnify Arouh, in his capacity as an officer, "who is a party to, or is threatened to

14 be made a party to, . . . or is otherwise involved in, any Proceeding, by reason of the

15 fact that he . . . was an officer of the corporation. . .." The term Proceeding "means

16 any pending . . . action or suit, whether civil, . . . administrative or investigative."

17 Moreover, Arouh "shall be indemnified and held harmless by the corporation for all

18 actions taken by him and for all omissions, to the fullest extent permitted by Nevada

19 law, against all expenses, liability and loss (including without limitation, attorneys'

20 fees [and] costs . . .) reasonably incurred or suffered by [Arouh] in connection with

21 any Proceeding." Finally, "Indemnification . . . shall continue as to [Arouh] who has

22 ceased to be . . . an officer . . .."  (Emphasis added).

23 241.  In addition to the indemnification obligation GAN Nevada, Inc. provided

24 to Arouh pursuant to its bylaws, Defendants agreed to indemnify Arouh pursuant to

25 his Employment Agreement, which provides that "[t]he Parties have executed an

26 Indemnification Agreement, attached hereto [sic] Exhibit B and incorporated by

27 reference. The Company shall indemnify, defend, and hold harmless Executive from

28 and against Claims, losses, damages, liabilities, actions, judgments, court costs, and

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  legal and other expenses pursuant to the terms of the Indemnification Agreement."
2  Exhibit B to the Employment Agreement is referred to herein as the "Indemnification
3  Agreement."

4        242.   Defendants knew Arouh would not knowingly abridge, abrogate, limit,
5  waive, cancel or otherwise reduce the rights in his Employment Agreement.
6  Defendants surreptitiously tried to dupe Arouh into signing away his Indemnification
7  Rights two days before they fired him. On December 6, 2021, less than 72 hours
8  before Defendants fired Arouh, Defendants' sent Arouh a new employment
9  agreement to sign and Defendants represented the new employment agreement was
10 the same form of employment agreement that all members of the Executive
11 Committee were being asked to sign.

12       243.   Defendants' representation was false.

13       244.   On information and belief, Plaintiff alleges that the truth is that no other
14 member of the Executive Committee was being asked to sign the same form of
15 employment agreement that Defendants asked Arouh to sign on December 6, 2021.

16       245.   Rather, Defendants asked Arouh to sign a new employment agreement
17 that drastically reduced Arouh's then-existing indemnification rights. The new
18 employment agreement would have terminated Arouh's 10-page Indemnification
19 Agreement.

20       246.   Arouh did not sign the new employment agreement that Defendants
21 requested that he sign on December 6, 2021.

22       247.   Tellingly, Defendants even refused to provide Arouh with a copy of the
23 Indemnification Agreement attached to Arouh's Employment Agreement.
24 Defendants' refusal to turn over a document as required by law is even more specious
25 since Arouh specifically identified the Indemnification Agreement as a document that
26 Defendants were required to provide to him. Arouh sent a letter to Defendants, dated
27 February 2, 2022, by and through his counsel, in which Arouh demanded "[p]ursuant
28 to California Labor Code section 1198.5, [that Defendants] produce Mr. Arouh's * *

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

* indemnification agreement." Defendants refused to do so. Defendants' fraudulent and illegal conduct is obvious when reviewing the Employment Agreement that Defendants did provide, which does have the cover sheet for the Indemnification Agreement attached. For example, the cover sheet specifically states what is attached is "Exhibit B (GAN Indemnification Agreement)]; on information and belief, in responding to their obligations under Section 1198.5, Defendants intentionally removed the Indemnification Agreement that was attached to Arouh's Employment Agreement prior to producing to Arouh his employment file in an attempt to conceal the Indemnification Agreement.

248. Defendants are required to indemnify Arouh in accordance with the terms of the Indemnification Agreement. The Indemnification Agreement provides that "[t]he Company shall indemnify . . . Indemnitee [(Arouh)], to the fullest extent permitted by applicable law, from and against all Liabilities and Expenses suffered or incurred by Indemnitee or on Indemnitee's behalf in connection with or as a consequence of any Proceeding  * * *  or any claim, issue or matter therein, if Indemnitee [(Arouh)] acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company . . .. [A] finding, admission or stipulation that an Indemnitee [(Arouh)] has acted with gross negligence or recklessness shall not, of itself, create a presumption that such Indemnitee [(Arouh)] has failed to meet the standard or conduct required for indemnification in this Section . . .."

249. The "Company," as referred to in the Indemnification Agreement that was incorporated by reference into the Employment Agreement, includes GAN Limited, in its own name and on behalf of its direct and indirect subsidiaries. The Company in the Indemnification Agreement is, as alleged with respect to the Employment Agreement, broad enough to include each of the Defendants.

250. To the extent that any of the Defendants are not within the definition of the Company in the Indemnification Agreement, then such Defendants are part of a

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

joint venture with, an alter-ego of, an agent of, a joint enterprise with, or otherwise aided and abetted the Company in connection with the Company's contractual obligations under the Indemnification Agreement.

251. The instant action is a Proceeding as defined by the Indemnification Agreement, which defines that term to mean, in relevant part: "any threatened [or] pending . . . action, claim, suit, arbitration, inquiry or investigation, litigation, . . . or any other actual, threatened or completed judicial, administrative or arbitration proceeding . . ., whether brought in the right of the Company or otherwise, and whether of a civil . . . administrative or investigative nature, in which Indemnitee was, is or will be . . . involved as a party . . ., affected or injured (i) by reason of the fact that Indemnitee is or was a Representative of the Company, (ii) by reason of any actual or alleged action taken by Indemnitee or of any action on Indemnitee's part while acting as Representative of the Company * * *. (emphasis added)"

252. Arouh is or was a Representative of GAN as contemplated in the forgoing definition of Proceeding, since the term Representative is defined by the Indemnification Agreement to mean any ". . . officer . . . and employee . . ."

253. GAN is required to advance Arouh expenses in accordance with the terms of the Indemnification Agreement. The Indemnification Agreement provides in Section 7, that "[i]n furtherance of the requirement of by-law 118 of the By-laws (which refers to a second, independent obligation of GAN to indemnify Arouh pursuant to the By-laws, which, again, is separate and an addition to GAN's contractual obligation to indemnity Arouh set forth in the Indemnification Agreement) and notwithstanding any provision of this [(Indemnification)] Agreement to the contrary, the Company shall advance, to the fullest extent permitted by law, Expenses incurred by Indemnitee [(Arouh)] in connection with any Proceeding . . .. * * * Advances shall include any and all Expenses incurred pursuing an action to enforce this right of advancement . . ."

254. Plaintiff has and will incur attorneys' fees and costs in an amount to be

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

determined at trial.

255.   Prior to submission of this complaint, Arouh, by and through his attorneys, submitted a demand for Defendants "to pay then-existing legal fees in the amount of $410,000, plus $400,000 as an initial advance against expected fees in the next months in this matter; at no time since have Defendants paid any of Arouh's existing fees, nor paid any of the advance legal fees as Defendants contractually agreed.

256.   Arouh's demand, by and through counsel, on February 2, 2022, and, again, on July 21, 2023, and Defendants' refusal to even provide the Indemnify Agreement that GAN agreed to, constituted the requisite notice and request for indemnification in accordance with the Indemnity Agreement, Section 8(a); accordingly, under the terms of the Indemnity Agreement, Section 9(a), "the Company shall advance Expenses necessary to defend against a claim pursuant to Section 7 hereof."

257.   Defendants specifically agreed to not seek a "bar-order" from paying Arouh Expenses under the Indemnification Agreement.   The Indemnification Agreement provides, on information and belief, in Section 15(c), that "[t]he Company shall not seek from a court . . . a "bar order" which would have the effect of prohibiting or limiting Indemnitee's rights to receive advancement of expenses under this Agreement."

## U. **Arouh Law, PLLC Invoices**

258.   On June 24, 2020, GAN entered an agreement with Arouh Law, PLLC wherein Arouh Law, PLLC would provide legal services in exchange for payment ("Legal Services Agreement").   Arouh Law, PLLC provided legal services to GAN and GAN benefitted from such services, however, GAN failed to pay.

259.   Arouh Law, PLLC provided legal services to GAN pursuant to the Legal Services Agreement from approximately June 26, 2020 through March 2021.

260.   The Legal Services Agreement provided that Arouh's then hourly rate

67

was $750.

261.    Arouh Law, PLLC had the right to "write off" time from the bill to GAN; however, such write-offs were expressly contingent on GAN not disputing payment of the remaining items billed to GAN Limited.

262.    The Legal Services Agreement expressly provides that: "All 'no Charge' or 'written off' costs, expenses, and fees for legal services will be considered payable in full in the event of a formal dispute … regarding Client's bill."

263.    The Legal Services Agreement provides: "These provisions are written to prevent a situation where this firm [Arouh Law, PLLC] reduces your bill by writing off costs, expenses, and fees for legal services during a matter, and then client seeks to reduce the sums owed further by disputing client's responsibility to pay the reduced sum. They are intended to provide incentives for both this firm and you to resolve, informally and promptly, any questions or concerns about the legitimacy of any item billed on any statement, and to provide certainty that once a statement is thirty days old, the costs, expenses, and fees for legal services reflected on that statement are agreed by this firm and you to have been accurate and correct.

264.    Arouh Law, PLLC wrote off $300/hour on its invoices; however, in light of GAN's disputing Arouh Law, PLLC's three invoices in the chart below, the entire amount ($450/hour billed plus $300/hour written off) is due and payable.

265.    GAN agreed in the Legal Services Agreement "to pay any fees and costs that are incurred by [Arouh Law, PLLC] to collect fees, costs, or expenses from [GAN], including reasonable attorney's fees."

266.    GAN also agreed in the Legal Services Agreement that "[a]ll charges for the Current Fee shall be paid within 20 business days from the date of mailing or emailing of each such statement . . .."

267.    GAN honored the Legal Services Agreement for the first six months. Specifically, GAN timely and fully paid Arouh Law, PLLC's invoices for services to GAN from July 2020 to December 2020.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

268.   From January 2021 to March 2021, Arouh Law, PLLC issued monthly invoices to GAN.  GAN approved each of these monthly invoices for payment.  GAN, however, never actually paid Arouh Law, PLLC's invoices for January, February and March 2021.

269.   Arouh Law, PLLC has demanded payment in writing on February 2, 2022. GAN has refused.

270.   The Legal Services Agreement provides: "Whether or not you [GAN] call with such an inquiry, any dispute as to the accuracy or validity of any billed charges, or requests for adjustment of any costs, expenses, or fees for legal services billed to you must be made in writing to me within the earlier to occur of (i) 20 days of the date of the statement containing that cost, expense, or fee for legal services, and (ii) the time when such billed charges are paid by you. If you do not do so, the statement will be conclusively presumed to be correct."

271.   At no time and in no way has GAN disputed any of the Arouh Law, PLLC invoices. Three invoices remain outstanding. The amount due as of July 30, 2023 regarding the invoices is set forth in the following table, and interest continues to accrue until paid in full.

Arouh Law, PLLC Invoices to GAN Limited and Interest Owed

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Invoice Amount and invoiced date to GAN Limited | Date Fees Due "All charges for the Current Fee shall be paid within 20 business days from the date of mailing or emailing of each such statement." | Invoiced Amount (With $300/hr Write-Off) Plus Interest to 7/30/23. Interest due at rate of 10% from 20 days after each statement. Through July 30, | Amount of invoice. adjusted per Legal Services Agreement to include $300 write-off ($750/hour). | Interest due on col. 4 per Legal Services Agreement through July 30, 2023 at 10% | Adjusted Invoice Plus Interest as of on July 30, 2023. Interest post July 30, 2023 is accruing. |

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

| Invoice | Date | Amount | Hours | | |
|---|---|---|---|---|---|
| | | 2023 | | | |
| January 28, 2021 Invoice (original amount for Services rendered to GAN for December 2020, for $14,549.99). | Feb 26, 2021, is the date 20 business days after Jan 28, 2021, including Jan 28, 2021 but excluding Feb 26, 2021 | $18,074.21 (Interest component is $3,524.22) | Hours: 32.2 x $750 = $24,249.99 | $5,873.70 | $30,123.69 |
| February 1, 2021 Invoice (original amount for Services rendered to GAN for January 2021, for $13,500). | Mar 2, 2021, is the date 20 business days after Feb 1, 2021, including Feb 1, 2021 but excluding Mar 2, 2021. | $16,753.56 (Interest component is $3,253.56). | Hours: 30 x $750 = $22,500.00 | $5,422.60 | $27,922.60 |
| March 10, 2021 Invoice (original amount for Services rendered to GAN for February 2021, for $36.975). | Apr 7, 2021, is the date 20 business days after Mar 10, 2021, including Mar 10, 2021 but excluding Apr 7, 2021. | $45.527.37 (Interest component is $8.552.37). | Hours: 82.1 x $750 = $61.625.00 | $14,253.95 | $75,878.95 |
| | | | | $25,550.25 | $133,925.24 |
| Estimated Collection Fees through July 30, 2023 $2.500 | | | | | |
| Amount Owed to Arouh Law, PLLC as of July 30, 2023 (After July 30, 2023, Arouh Law, PLLC is entitled to recover interest at 10% and additional collection fees.) | | | | | $272,403.48 |

272.   Plaintiff Law Firm is informed and believes, and thereon alleges, that GAN owes Arouh Law, PLLC, an amount to be proved at trial for services rendered (prior to Arouh becoming an employee of GAN), plus pre and post judgment interest on the liquidated amounts and attorneys' fees per the Legal Services Agreement.

273.   Arouh Law, PLLC submitted itemized invoices to GAN as set forth above.

i.   The above chart sets forth all the requisite amounts, dates, interests and fees through July 30, 2023. Additional interest post July 30,

70

GARCIA & ARTIGLIERE

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

2023 is also owed by GAN. Additional collection fees are also owed.

ii.    GAN approved all the invoices issued by Arouh Law, PLLC.

iii.    GAN did not object to any of the invoices issued by Arouh Law, PLLC.

iv.    GAN failed to pay any of the invoices listed in the chart.

v.    Pre-judgment and post-judgment interest is accruing at the rate of 10% per annum.

vi.    Attorneys' fees accruing per terms of contract.

vii.    The exact damages caused by GAN Limited's breach of contract will be provided at trial, and is in excess of the jurisdictional minimum of this court.

## V.   Causes of Action

### FIRST CAUSE OF ACTION

#### (Wrongful Termination)

#### (Plaintiff Against All Defendants)

274.   Plaintiff alleges and incorporates by reference each and every allegation of the above paragraphs as though fully set forth herein.

275.   Plaintiff was an employee of Defendants.

276.   Plaintiff is informed and believes, and thereon alleges, that Defendants terminated Plaintiff in violation of public policy, for discriminatory reasons, for exercising Plaintiff's legal rights, and/or in violation of the Employment Contract. The discrimination and violation of public policy was a substantial factor in Defendants' termination decision.

277.   Defendants' wrongful termination was in violation of public policy, including but not limited to state law, such as California's Fair Employment and Housing Act ("FEHA").

278.   Defendants' wrongful termination was in violation of public policy,

including but not limited to terminating Arouh for his insistence on following the law and requiring GAN to follow the law.

279.   Defendants' outrageous workplace conduct was aimed at causing Plaintiff emotional distress and mental suffering.

280.   Defendants engaged in the discriminatory practices alleged with malice and/or reckless indifference.

281.   Defendants' conduct caused Plaintiff damages, as prayed for herein, in an amount to be established at trial.

282.   Plaintiff suffered damages as a result of Defendants' conduct, including emotional distress, mental suffering, loss of professional reputation, loss of back pay, loss of front pay, attorneys' fees, and punitive damages.

283.   Plaintiff timely filed his common law claim within two years. See Code of Civil Procedure 335.1 for tort actions based on injuries to plaintiff caused by the wrongful act or neglect of others. *See also Prue v. Brady Co.,* (2015) 242 Cal.App.4th 1367 (holding that wrongful termination in violation of public policy claims are not barred by the FEHA's one-year statute of limitations because two-year statute for tort actions applies); Stevenson v. Superior Court (1997) 16 Cal.4th 880, 889-890.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Employment Contract)

### (Plaintiff Against All Defendants)

284.   Plaintiff alleges and incorporates by reference each and every allegation of the above paragraphs as though fully set forth herein.

285.   Defendants entered into an employment contract with Plaintiff.

286.   Defendants breached the employment contract with Plaintiff by failing to perform in accordance with the contract's terms.

287.   Plaintiff fully performed under his employment contract or was excused from performing or prevented from performing.

288.   Defendants' breach of contract was a substantial factor in causing

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  Plaintiff's harm.

2      289.   Plaintiff suffered damages due to the breach in an amount to be proved

3  at trial.

4      290.   Plaintiff also seeks specific performance of the contract.

5                    **THIRD CAUSE OF ACTION**

6  **(Breach of Implied Covenant of Good Faith and Fair Dealing – Employment**

7                            **Contract)**

8                   **(Plaintiff Against All Defendants)**

9      291.   Plaintiff alleges and incorporates by reference each and every allegation

10  of the above paragraphs as though fully set forth herein.

11     292.   Defendants entered into an employment contract with Plaintiff.

12     293.   Plaintiff fully performed under his employment contract or was excused

13  from or prevented by Defendants from performing.

14     294.   Defendants breached the employment contract with Plaintiff by failing

15  to perform in accordance with the contract's terms.

16     295.   Defendants acted to deny Plaintiff the benefits under this employment

17  contract.  Defendants engaged in conduct, separate and apart from performance under

18  the contract, without good faith and for the purpose of depriving Plaintiff of his rights

19  and benefits under the contract.

20     296.   Defendants, among other breaches, wrongfully purported to terminate

21  Plaintiff for cause, notwithstanding the fact that Defendants knew that they did not

22  have cause under the contract.

23     297.   Defendants, among other breaches, wrongfully violated confidentiality

24  provisions in the contract to interfere with Plaintiff's ability to obtain alternate

25  employment and to damage his reputation.

26     298.   Defendants' breaches prevented Plaintiff from receiving the benefits

27  under the contract.

28     299.   Defendants acted unfairly and in bad faith when they breached the

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

73

contract. Defendants did not act fairly. Defendants' actions, including (a) purporting to terminate Plaintiff for cause, when Defendants lacked a good faith basis for doing so; and (b) violating confidentiality provisions, for an improper motive, caused Plaintiff harm in an amount to be proved at trial.

300.    Defendants' breach of the covenant of good faith and fair dealing harmed Plaintiff in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
### (Waiting Time Penalties- Cal. Labor Code 203)
### (Plaintiff Against All Defendants)

301.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

302.    Plaintiff is informed and believes, and thereon alleges, that Defendants violated California Labor Code 203 in that Defendants willfully withheld (intentionally failed or refused to pay) from Plaintiff's final paycheck all "wages," as defined in Labor Code Section 200.

303.    The term wages includes all amounts for labor performed by an employee, whether the amount is calculated by time, task, piece, commission, or some other method.

304.    Plaintiff timely brought this claim within three years.

## FIFTH CAUSE OF ACTION
### (Declaratory Relief)
### (Plaintiff Against All Defendants)

305.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

306.    Plaintiff requests that the Court enter a declaration that:

(a)    Michael Arouh was not terminated for "cause" as that term is defined in the Employment Agreement.

(b)    Michael Arouh is entitled to receive the benefits set forth in the

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

74

Employment Agreement, as modified in writing and orally, including Paragraph 7(d) ("Termination Without Cause") without any further conditions, delay and offsets, with the COBRA payments for group health benefits that would have been due paid to Arouh in cash.

(c)     Michael Arouh is entitled to receive the Change in Control Payments and Benefits as though Executive's employment was terminated by GAN without Cause, in accordance with the Employment Agreement, Paragraph 8.

(d)     Michael Arouh retains existing equity grants as of the time immediately prior to termination.

(e)     Michael Arouh has or will be issued, in accordance with their terms at the time immediately before termination, the equity grants that an executive would be entitled to if terminated without cause, with a strike price based on the lowest closing Company stock price preceding the filing date of this complaint.

(f)     Michael Arouh's equity grants that have and will be issued will vest in accordance with their terms as if terminated without cause.

(g)     Michael Arouh's equity grants that have vested will be deemed sold to GAN and paid out to Michael Arouh at the highest trading price of GAN stock at any time between the date the equity grant should have vested as if Arouh were terminated without cause and the date of this Court's order, plus interest of 9% annually.

(h)     Michael Arouh is entitled to receive the Garden Leave Compensation set forth in the Agreement, Paragraph 11.b.

(i)     Michael Arouh is entitled to receive expense reimbursements for expenses incurred while an employee.

(j)     Defendant shall deliver to counsel for Michael Arouh a true and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

correct copy of the Indemnification Agreement the parties executed and attached to the Employment Agreement as Exhibit B.

(k)   Defendants and their affiliates, and their respective employees, representatives and agents shall refrain from all of the following: (i) any disparagement, defamation, libel, or slander of Michael Arouh, (ii) make any statements that may be considered to be derogatory or detrimental to Michael Arouh's good name or reputation, (iii) make any statement other than dates of employment and positions held by Michael Arouh upon his express written consent to do so, and (iv) discussing and disclosing, directly and indirectly, any matter contemplated or regarding this complaint.

(l)   Michael Arouh is entitled to indemnification in an amount to be determined at trial.

307. The requested declaration is a proper subject for declaratory relief.

308. The Employment Agreement between Defendants and Plaintiff defines "cause."

309. The Employment Agreement specifies executive is entitled to the relief requested if terminated without cause.

310. There is an actual controversy involving justiciable questions relating to Plaintiff's and Defendants' rights and obligations, specifically, whether Defendants properly terminated Arouh for cause, and if not, whether Arouh is entitled to the Employment Agreement benefits for an executive terminated without cause.

311. GAN's Termination Letter stated the termination was for "cause" under the Employment Agreement. Despite request, GAN refused to confirm that Arouh is entitled to Change in Control Payments and Benefits, refused to confirm Arouh retains existing equity grants, and refused to confirm Arouh has or will be issued future equity

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

grants that an executive terminated without cause would be entitled to under the Employment Agreement.

312.   Arouh disputes the for "cause" termination. This is material because it is a disclosable fact if Arouh seeks future licensing from gaming commissions and other employers.

313.   Pre-suit, Arouh requested that GAN retract its for cause termination and confirm the other matters alleged in this cause of action.

314.   GAN refused to retract its for cause termination. GAN refused to confirm that contractual rights of an executive terminated without cause were applicable to Arouh.  GAN refused all relief that this Court is now being asked to declare.

315.   California Code of Civil Procedure Section 1060 provides: "Any person interested under a written instrument, … or under a contract, or who desires a declaration of his or her rights or duties with respect to another, … may in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action … in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."

## SIXTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

### (Plaintiff Against All Defendants)

316.   Plaintiff alleges and incorporates by reference each and every allegation of the above paragraphs as though fully set forth herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

317. After Defendants wrongfully terminated Plaintiff, Plaintiff was interviewing with prospective employers and business contacts to form an economic relationship that would have resulted in an economic benefit to Plaintiff.

318. Defendants knew of the relationship between Plaintiff and such third parties.

319. Defendants engaged in tortious interference, including but not limited to telling such third parties confidential and/or false statements about Plaintiff. Defendants violated a contract and/or engaged in misrepresentations and/or defamed Plaintiff when they wrongfully interacted with Plaintiff's potential employers.

320. By engaging in this conduct with such third parties, Defendants intended to disrupt the relationship or knew that disruptions of the relationship were certain or substantially certain to occur.

321. The Employment Agreement prohibits "Company Representatives," including but not limited to the Board, President, Executives (e.g. Vice Presidents), "both during and after Executive's employment with the Company," from any disparagement, defamation, libel or slander of any of Executive." This was drafted by the employer.

322. The Employment Agreement thus prohibits the Defendants and Company Representatives from engaging in the wrongful disparagement, defamation, libel and slander of Arouh.

323. Defendants violated the Employment Agreement in this material regard.

324. The relationship between Plaintiff and such third parties was disrupted.

325. Plaintiff was harmed by Defendants' interference.

326. Defendants' conduct was a substantial factor in causing harm.

327. Defendants intentionally interfered with an economic relationship between him and third-party potential employers that probably would have resulted in an economic benefit to Plaintiff.

328. Defendants acted with malice, oppression and fraud.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1    329.    Defendants' conduct caused Plaintiff harm in an amount to be proved at
2    trial.

3    330.    Plaintiff seeks economic damages, punitive damages and injunctive
4    relief.

5                       **SEVENTH CAUSE OF ACTION**
6         **(Negligent Interference with Prospective Economic Advantage)**
7                       **(Plaintiff Against All Defendants)**

8    331.    Plaintiff alleges and incorporates by reference each and every allegation
9    of the above paragraphs as though fully set forth herein.

10    332.    After Defendants wrongfully terminated Plaintiff, Plaintiff was
11    interviewing with prospective employers and business contacts to form an economic
12    relationship that would have resulted in an economic benefit to Plaintiff.

13    333.    Defendants knew or should have known of the relationship between
14    Plaintiff and such third parties.

15    334.    Defendants knew or should have known that this relationship would be
16    disrupted if Defendants failed to act with reasonable care.

17    335.    Defendants failed to act with reasonable care.

18    336.    Defendants negligently interfered with Plaintiff's prospective economic
19    relations, including but not limited to by telling such third parties contractually
20    protected confidential information and/or false statements/misrepresentations about
21    Plaintiff and/or defamatory statements about Plaintiff.

22    337.    By engaging in this conducted with such third parties, Defendants
23    disrupted the relationship between Plaintiff and such third parties.

24    338.    The relationship between Plaintiff and such third parties was disrupted.

25    339.    Plaintiff was harmed by Defendants' interference.

26    340.    Defendants' conduct was a substantial factor in causing harm.

27    341.    Defendants' interference with the economic relationship between
28    Plaintiff and third-party potential employers was a substantial factor in causing

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  Plaintiff's harm.

2      342.  Plaintiff was harmed in an amount to be proved at trial.

3      343.  Defendants acted with malice, oppression and fraud.

4      344.  Defendants' conduct caused Plaintiff harm in an amount to be proved at
5  trial.

6      345.  Plaintiff seeks economic damages, punitive damages and injunctive
7  relief.

8                    **EIGHTH CAUSE OF ACTION**

9              **(Breach of Contract – Law Firm Contract)**

10          **(Plaintiff Law Firm Against GAN and Does 1-100)**

11      346.  Law Firm repeats and realleges each of the allegations contained in the
12  foregoing paragraphs (with the exception of allegations in causes of action
13  paragraphs) as if fully set forth at length herein.

14      347.  Law Firm alleges it entered into an agreement for legal services with
15  Defendants.

16      348.  Defendants breached the agreement for legal services by failing to pay
17  Law Firm and otherwise perform in accordance with the contract's terms.

18      349.  Law Firm fully performed under the agreement for legal services or was
19  excused from performing or prevented by Defendants from performing.

20      350.  Defendants' breach of contract caused Law Firm harm. Law Firm
21  suffered damages due to Defendants' breach in an amount to be proved at trial.

22                      **W.  PRAYER**

23  I.    Plaintiff Arouh Prayer:

24      WHEREFORE, by virtue of the foregoing acts and omissions complained of,
25  Plaintiff requests that judgment be issued in his favor, and against *all Defendants*,
26  jointly and severally, on each of the foregoing claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and
27  11, together with the following relief:

28      A.    For the First Cause of Action (Wrongful Termination)

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1.    Compensatory damages, including lost past and future wages and benefits;

2.    Non-economic damages, including damages for emotional distress, mental suffering, and loss of professional reputation;

3.    Punitive damages; and

4.    Attorney's fees;

B.    For the Second Cause of Action (Breach of Contract- Employment Contract)

1.    Expectation damages;

2.    Liquidated damages;

3.    Specific Performance; and

4.    Attorney's fees;

C.    For the Third Cause of Action (Breach of Implied Covenant of Good Faith and Fair Dealing)

1.    Expectation damages;

2.    Liquidated damages;

3.    Specific Performance; and

4.    Attorney's fees;

D.    For the Fourth Cause of Action (Waiting Time Penalties)

1.    Waiting Time Penalties;

E.    For the Fifth Cause of Action (Declaratory Relief)

A declaration as follows:

1.    Michael Arouh was not terminated for "cause" as that term is defined in the Employment Agreement.

2.    Michael Arouh is entitled to receive the benefits set forth in the Employment Agreement, as modified in writing and orally, including Paragraph 7(d) ("Termination Without Cause") without any further conditions, delay and offsets, with the COBRA

81

1  payments for group health benefits that would have been due paid
2  to Arouh in cash.

3.  Michael Arouh is entitled to receive the Change in Control Payments and Benefits as though Executive's employment was terminated by GAN without Cause, in accordance with the Employment Agreement, Paragraph 8.

4.  Michael Arouh retains existing equity grants as of the time immediately prior to termination.

5.  Michael Arouh has or will be issued, in accordance with their terms at the time immediately before termination, the equity grants that an executive would be entitled to if terminated without cause, with a strike price based on the 30-day closing average of the Company's stock price preceding the filing date of this complaint.

6.  Michael Arouh's equity grants that have and will be issued will vest in accordance with their terms as if terminated without cause.

7.  Michael Arouh's equity grants that have vested will be deemed sold to GAN and paid out to Michael Arouh at the highest trading price of GAN stock at any time between the date the equity grant should have vested as if Arouh were terminated without cause and the date of this Court's order, plus interest of 9% annually.

8.  Michael Arouh is entitled to receive the Garden Leave Compensation set forth in the Agreement, Paragraph 11.b.

9.  Michael Arouh is entitled to receive expense reimbursements for expenses incurred while an employee.

10.  Defendant shall deliver to counsel for Michael Arouh a true and correct copy of the Indemnification Agreement the parties executed and attached to the Employment Agreement as Exhibit B.

11.  Defendants and their affiliates, and their respective employees,

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

representatives and agents shall refrain from all of the following: (i) any disparagement, defamation, libel, or slander of Michael Arouh, (ii) make any statements that may be considered to be derogatory or detrimental to Michael Arouh's good name or reputation, (iii) make any statement other than dates of employment and positions held by Michael Arouh upon his express written consent to do so, and (iv) discussing and disclosing, directly and indirectly, any matter contemplated or regarding this complaint.

12.    Michael Arouh is entitled to indemnification in an amount to be determined at trial.

F.    For the Sixth Cause of Action (Intentional Interference with Prospective Economic Advantage)

1.    Economic damages;

2.    Punitive damages;

3.    Preliminary injunctive relief; and

4.    Permanent injunctive relief;

G.    For the Seventh Cause of Action (Negligent Interference with Prospective Economic Advantage)

1.    Economic damages;

2.    Punitive Damages;

3.    Preliminary injunctive relief;  and

4.    Permanent injunctive relief;

H.    For all Causes of Action

1.    For reasonable attorneys' fees and expenses as permitted by law;

2.    For costs of suit herein incurred;

3.    For pre- and post-judgment interest; and

4.    For such other and further relief as the Court may deem just and

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

1    proper.

2    II.    Plaintiff Arouh Law Firm Prayer:

3    WHEREFORE, by virtue of the foregoing acts and omissions complained of,

4    Law Firm requests that judgment be issued in its favor, and against *GAN and Does*

5    *100,* jointly and severally, on the foregoing claims enumerated as claims 12, 13 and

6    14, together with the following relief:

7    A.    For the Eighth Cause of Action (Breach of Contract – Legal Services

8    Agreement)

9    1.    Expectation damages;

10    2.    Liquidated damages;

11    3.    Specific Performance; and

12    4.    Attorney's fees;

13    III.    Plaintiff Arouh and Plaintiff Arouh Law Firm Prayer:

14    WHEREFORE, by virtue of the foregoing acts and omissions complained of,

15    Plaintiff and Law Firm request that judgment be issued in its favor, and against

16    Smurfit, Wong and Does 100, jointly and severally, on the foregoing claims

17    enumerated as claims 12, together with the following relief:

18    A.    For the Twelfth Cause of Action (RICO)

19    1.    Damages According to Proof;

20    2.    Treble Damages; and

21    3.    Attorney's fees;

22    IV.    For all Causes of Action

23    1.    For reasonable attorneys' fees and expenses as permitted by law;

24    2.    For costs of suit herein incurred;

25    3.    For pre- and post-judgment interest; and

26    4.    For such other and further relief as the Court may deem just and proper.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx

GARCIA & ARTIGLIERE
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    DATED:  October 24, 2023        **GARCIA & ARTIGLIERE**

2

3

4        By: _Stephen M. Garcia_ _____

5        Stephen M. Garcia
         David M Medby
6        Attorneys for Plaintiffs Michael B. Arouh
         and Arouh Law, PLLC
7

8

9            <u>**DEMAND FOR JURY TRIAL**</u>

10   Plaintiffs hereby demand a trial by jury on all matters triable by a jury.

11   DATED:  October 24, 2023        **GARCIA & ARTIGLIERE**

12

13

14       By: _Stephen M. Garcia_ _____

15       Stephen M. Garcia
         David M Medby
16       Attorneys for Plaintiffs Michael B. Arouh
         and Arouh Law, PLLC
17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
M:\Arouh, Michael (23-117)\Pleadings\Complaint.docx